[No. C000029. Third Dist. Dec. 20, 1988.]

STOCKTON NEWSPAPERS, INC., Petitioner, v.
THE SUPERIOR COURT OF SAN JOAQUIN COUNTY,
Respondent;
WILSON STEWART, Real Party in Interest.

COUNSEL

Cavalero, Bray, Geiger & Rudquist, John B. Rudquist, Crosby, Heafey, Roach & May, Peter W. Davis, John E. Carne and Judith R. Epstein for Petitioner.

No appearance for Respondent.

Babitzke & Meleyco, Kenneth N. Meleyco and Patricia K. Ferguson for Real Party in Interest.

OPINION

BLEASE, Acting P. J.—Must a newspaper be convinced that a charge of official misconduct is true before it may publish conflicting accounts of the charge, free of a claim of libel? We conclude that it need not. We hold that a

newspaper is privileged to print a fair report, attributed to a third party, of a claim of official misconduct denied by the official, and is under no duty to resolve conflicting claims of what happened. (Civ. Code, § 47, subd. 3.)

This original proceeding arises out of a libel action by Wilson Stewart, a City of Stockton police officer, against defendant Stockton Newspapers, Inc. (Stockton Newspapers), a newspaper publisher. Stewart claims that a newspaper article published by defendant is libelous because it reports an accusation that he improperly procured a false confession to a crime from a person later released as innocent of the crime. The article presents both the accusations of impropriety, made by the person who confessed, and Stewart's denial.

Stockton Newspapers was denied a summary judgment (Code Civ. Proc., § 437c), sought on the grounds that the undisputed facts adduced show that the publication of the Stewart article was privileged under Civil Code section 47, subdivision 4 and the First Amendment.[1] This writ proceeding followed. We will issue a peremptory writ directing the trial court to grant summary judgment.

FACTS AND PROCEDURAL BACKGROUND

The following predicate facts, adduced in the papers submitted at the summary judgment proceeding, are undisputed.

Stockton Newspapers, Inc., the petitioner, publishes and circulates the Stockton Record, a daily newspaper. On February 6, 1980, the allegedly libelous article entitled "Teen's Month Behind Bars After A Phony Confession" was published in the Stockton Record. The text of the article is as follows, with the portions Stewart alleges to be defamatory underlined.

*The Text of the Newspaper Article*

"When a detective came to his door on Dec. 20, Aubrey Lewis Miles knew he already had three strikes against him—he was black, he was poor and he wasn't as smart as the people he was dealing with. [¶] Miles, 19, was questioned about and then confessed to a murder he didn't commit. He spent more than 30 days in jail before the district attorney's office, itself growing skeptical about the confession, released him and dropped the charges. [¶] Miles—who has the 'mind of a 9-year-old,' according to his family—was confronted at his front door at about 8 p.m. that night by Sgt. Wilson Stewart, a police officer for more than 25 years, and a 12-year veteran as a detective. [¶] Miles' grandmother, Mrs. Ruth Washington recalls: 'Stewart said he wanted to talk to him privately outside the house. I

---

[1] All further references to sections are to the Civil Code unless otherwise indicated.

said they could.' [¶] But instead, Miles was taken to police headquarters where he was questioned for about two hours. [¶] That night the youngster confessed to the murder of Arcus Brown, who was gunned down on a downtown Stockton street before a crowd of Christmas shoppers a week earlier. [¶] Whether Miles blurted out a confession on some impulse or whether Stewart encouraged him into it remains unresolved. Suspect and interrogator give different accounts. [¶] Miles, a slow-spoken young man who has a speech impediment, says the policeman 'bribed me with candy' and told him that if he admitted to the murder he would be home in two or three days instead of after 25 years in prison or four years in a mental hospital. [¶] Stewart, on the other hand, says that Miles had called him on the phone, saying he knew something about Brown's murder. Later at police headquarters, 'he admitted everything to me. He sits there and calmly tells me this. I didn't solicit the confession, he voluntarily did it,' Stewart says. [¶] Stewart also says he has never been accused of coercing a confession out of a suspect. [¶] But according to Miles, who police said had never been arrested before, he confessed under extreme pressure. 'I said yes (I was involved in the killing) because I thought I was going to be released in two or three days,' Miles said. [¶] 'I was crying . . . he (the policeman) saw that . . . I was upset . . . he yelled at me. I didn't know what to think . . . I didn't know what to do . . . I just wanted to go home. I told him I didn't know . . . but he kept pressing and pressing. He told me, 'Too many people say you did it.' He told me I could remain silent, but I didn't even know what he was talking about,' Miles said. [¶] Confession in hand, Stewart then reportedly called the district attorney's office to have Miles charged with murder and conspiracy. [¶] Stewart said the confession was not tape recorded, and that there were no official transcripts made. 'When he came in and talked to me, I asked the D.A. on duty if he wanted a recording not a tape recording, but a stenographer, and he said "no," ' Stewart explained. [¶] Stewart says he cannot remember the name of the deputy district attorney on duty that night. [¶] Miles was booked into jail at 10:30 p.m. that Thursday night, too late to make the following day's arraignments. He could not be arraigned over the weekend, and on Monday, he was finally arraigned and then returned to jail on $75,000 bail. He did not have an attorney actively working his case until Wednesday, six days after his arrest. [¶] The district attorney's office proceeded routinely, according to Kenneth Meleyco, the deputy who ended up handling the case. [¶] 'The only evidence we had was the confession. When a man confesses you obviously put him in jail until you check out his story—unless it's obviously false.' [¶] Meleyco said he thinks it was a voluntary confession, despite holes that appeared in it later. 'All evidence I have seen . . . it was not coerced,' Meleyco said, 'I don't think he (Stewart) would ever do anything like that. [¶] Meleyco said he didn't know why Miles would confess to such a crime. [¶] However, Rolleen McIlwrath, Miles' court-appointed attorney, said, '(Miles) would

have said yes to anything given the fact that he can easily be led and that he wanted to go home. [¶] 'The confession was not enough for the arrest, it has to be corroborated. This one was not. There has to be some evidence besides a confession.' [¶] The district attorney's office, rapidly losing faith in its main evidence, was coming to the same conclusion. Meleyco said that his office—and Stewart as well—were always suspicious of Miles' statements because nothing he said was in line with the physical evidence in the case and with what witnesses had reported. [¶] In the meantime, Stewart maintained his interest in Miles and what he might have to say. [¶] Miles' half-brother, Booker Washington, 30, says that following Miles' arrest and before his arraignment, Stewart arranged a meeting between the two half-brothers at the San Joaquin County Jail, and that Stewart suggested that he take a 'notebook and pencil' to take notes. [¶] 'He (Stewart) never told me he was going to use me as a witness, but he did tell me to take a notebook and pencil,' Washington said. 'I couldn't believe it.' [¶] Miles said Stewart coached him to admit the crime to his brother 15 minutes before the brother's arrival at the jail. Stewart planted a story in his mind, he said, to tell his older brother —a false story of Miles' involvement in the murder. [¶] Miles said, 'He kept going over [the story]. After a while I began to believe it. He told me not to tell anybody.' [¶] Stewart, however, denies even being at the jail during or just before that meeting. [¶] Washington said, 'I started to believe his story. But I didn't know it was a lie. I couldn't believe it. I asked him why, and he said Stewart made him tell that story.' [¶] How Miles and the police originally got together is also unclear. [¶] Police say they received a telephone call from a male who identified himself as Miles and who told investigators that he, James Dennis Scott, 18, and Rachel Ramona Vargas, 18, were involved in the shooting of Brown. [¶] Miles 'just called the police and identified himself and Scott and the woman although the police weren't even looking for him at the time,' Meleyco said. [¶] According to Stewart, Miles called the police department three times to talk about the shooting. Miles said, however, he only called the police after learning through a friend that they were looking for him. [¶] Miles' lawyer, McIlwrath, said, 'It was a point of crisis. Once you have a crisis, I think problems are exposed and there are bound to be mistakes. When mistakes are made, we recognize it, correct it and apologize for it. I am not going to put the blame on any one individual.' [¶] Stewart says he had all charges against Miles and the other two original suspects dropped 'as soon as I found out that (another suspect) shot the guy.' [¶] His conclusion: 'I know now he wasn't involved. My opinion on this is that Aubrey called to get attention.' [¶] To Mrs. Washington, though, 'Aubrey has the mind of a 9-year-old. All I want is my boy's name cleared.'"

### The Other Evidence Tendered

Stockton Newspapers supported its motion for summary judgment with a declaration of Armando Durazo, the reporter who authored the article;

portions of Stewart's depositions; portions of Miles's grandparents' depositions; a declaration by Stewart relating the factual basis of his claim; a transcript of Durazo's interview of Miles; a psychiatric report on Miles while jailed; Stewart's report on the arrest of Miles; and a declaration by Michael Lopez, the editor responsible for the Miles article.

Durazo's testimony is as follows. Durazo was given the assignment of investigating a complaint that the paper's news coverage of the Arcus Brown murder and Miles's confession and incarceration was one-sided and unfair to Miles. Durazo interviewed Miles and Miles's half-brother, grandmother, grandfather, public defender, and defense investigator. The news article presents an accurate account of accusations made by Miles. Durazo also interviewed Stewart and Kenneth Meleyco, the deputy district attorney responsible for the Miles case. Durazo spoke with two other police officers concerning the Miles affair. Based on his investigation Durazo believed "that there was a genuine controversy" between Miles and Stewart over the manner in which the Stockton Police Department had treated Miles in its investigation and prosecution of this matter. Durazo "was unable to prove or disprove either Miles' [sic] or Stewart's version . . . ."

Stewart introduced excerpts from a deposition he conducted of Durazo. When deposed Durazo testified he had no knowledge of Stewart prior to writing this article. Durazo also testified as follows: "[Question]: At the time this article was printed—published, did you believe that Sgt. Stewart encouraged Miles into confessing to murder? [¶] [Answer]: Again, I had my doubts. I was skeptical, like most reporters are. [¶] Q. Well, did you believe it to be true? [¶] A. There was some indication, yes, that it may have been true. [¶] Q. Did you as a reporter, believe it to be true? [¶] A. I had perhaps a gut feeling that yes, it may be true. [¶] Q. What caused you during your investigation to believe that it was true? [¶] A. People that I talked to have given me a pretty good indication that what Miles was telling me was the truth."

Lopez's testimony is as follows. Lopez edited the article and added the first paragraph based on discussions with Durazo. He concluded that the article was factually accurate. "Although there was an unresolved controversy over the confession given by Aubrey Miles [, Lopez] believed this controversy was newsworthy." Stewart adduced a deposition excerpt that Lopez had no knowledge of Stewart prior to the time he edited the article.

Stewart's declaration relates the following. Stewart was assigned to investigate the Arcus Brown killing. Brown was shot with a .22-caliber rifle from a green Pontiac Grand Prix in Stockton. Witnesses said three people were in the car. On December 20, 1979, a person who said he was Aubrey Miles telephoned and said he was in the car at the time of the killing. The caller

said he shot Brown once in the arm with a .22-caliber rifle. He identified two other suspects in the shooting by name. Stewart went to Miles's house and told Miles's grandmother of the telephone conversation and that he wanted to take Miles to the scene of the murder. She agreed. He asked Miles to go and Miles agreed. He gave Miles a *Miranda* admonition (*Miranda* v. *Arizona* (1966) 884 U.S. 436 [16 L.Ed.2d 696, 86 S.Ct. 1602, 10 A.L.R.3d 974]). Miles's account at the scene was consistent with the physical evidence. Stewart brought Miles to the police department and despite Stewart's misgivings was instructed by Meleyco to arrest Miles. Stewart offered Miles a candy bar while at the police station but Miles declined the offer. Miles's grandfather came to the station and yelled at Miles who began crying. Three weeks after Miles was arrested one of the other suspects gave a full confession in exchange for immunity. The confession exonerated Miles. A week later he was released. Stewart told all of this to Durazo. He told Durazo that Miles's account was false. He suggested Durazo talk to the psychiatrist who would tell him Miles does not have the mind of a nine year old and was prone to making up stories. He suggested Durazo speak to two other police officers to confirm that Miles confessed over the telephone. He suggested that Durazo call the jail to verify that Stewart was not at the jail before the visit by his half-brother.

The trial court denied the motion for summary judgment. This writ proceeding followed.

DISCUSSION

I.

*Introduction*

The gravamen of Officer Stewart's claim of libel against Stockton Newspapers is that, when presented with conflicting reports of misconduct involving the officer and Miles, the newspaper elected to report both Stewart's and Miles's accounts of what happened, notwithstanding that the newspaper was skeptical about the truth of Miles's account. Stewart impliedly argues that this skepticism gives rise to an inference of malice precluding resolution of the issue on summary judgment. That argument fails as a matter of law.

A libel is a "false and unprivileged publication . . . ." (§ 45.) By this definition, the absence of a privilege is an element of the tort. (See *Block* v. *Sacramento Clinical Labs, Inc.* (1982) 131 Cal.App.3d 386, 389 [182 Cal.Rptr. 438].) A claim of privilege thus constitutes a direct attack upon the tort. The essence of Stockton Newspapers' defense is that a newspaper has a right to report the conflicting sides of a newsworthy story, notwith-

standing that it may have doubts about the accuracy of one or more of the accounts upon which the story is based. It anchors that right to a privilege to publish in such circumstances.

The defense of privilege is advanced by the newspaper under two theories: the absolute privilege to publish a report of official proceedings under section 47, subdivision 4 and the First Amendment privilege established by *New York Times Co. v. Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412] and its progeny. (See *McCoy v. Hearst Corp.* (1986) 42 Cal.3d 835 [231 Cal.Rptr. 518, 727 P.2d 711].)

As will be shown, the claim of absolute privilege fails in the context of defendant's motion for summary judgment. However, the undisputed material facts tendered in the summary judgment papers disclose another ground of resolution, that the newspaper article is conditionally privileged under subdivision 3 of section 47. This privilege was pled by the newspaper as an affirmative defense. The conditional privilege in these circumstances largely parallels the First Amendment privilege. Hence, the facts material to these theories were at issue in the summary judgment proceeding. Since the case can be resolved on the basis of the conditional privilege we have no occasion to resolve the issue as a matter of constitutional law. (Cf. e.g., *Kapellas v. Kofman* (1969) 1 Cal.3d 20 [81 Cal.Rptr. 360, 459 P.2d 912].)

## II.

■ Preliminarily we address Stockton Newspapers' claim that the article is a privileged publication by virtue of section 47, subdivision 4. It provides that a privileged publication is one made, "[b]y a fair and true report in a public journal, of (1) a judicial, (2) legislative, or (3) other public official proceeding, or (4) of anything said in the course thereof, or (5) of a verified charge or complaint made by any person to a public official, upon which complaint a warrant shall have been issued." Thus, if a false utterance is made at a qualified proceeding, subdivision 4 affords an absolute privilege for its accurate republication.

We do not resolve the predicate question whether a police interrogation qualifies as an "other public official proceeding" (see, e.g., *Ascherman v. Natanson* (1972) 23 Cal.App.3d 861 [100 Cal.Rptr. 656]; Rest.2d Torts, § 611, com. d.; compare § 47, subd. 4 with subd. 2) because, on the assumption that it is, there is a triable issue of material fact which precludes the resolution of this claim on defendant's motion for summary judgment.

■ A motion for summary judgment "shall be granted [only] if all the papers submitted show that there is no triable issue as to any *material fact* and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c), italics added.) Materiality is a question

of law (see 1 Witkin, Cal. Evidence (3d ed. 1986) § 286, p. 255), in this case the substantive law of privilege.

■ The privilege afforded by subdivision 4 applies only if the account of the (assumed privileged) proceeding, the police interrogation, is "true." But the summary judgment papers show that this fact is in dispute. The published account of the interrogation comes not from the author of the newspaper article, Armando Durazo, but from the subject of the interrogation, *Miles*. If *Miles's account* of the interrogation is not true the privilege provided by subdivision 4 is unavailable. (See, e.g., *Maher* v. *Devlin* (1928) 203 Cal. 270, 285-286 [263 P. 812]; cf. Rest.2d Torts, § 611, com. f; Prosser and Keeton on Torts (5th ed. 1984) § 115, p. 838.) Whether Miles's account is true is, on the papers submitted, in dispute. Accordingly, Stockton Newspapers has not made out the defense of privilege of section 47, subdivision 4 sufficient to entitle it to a summary judgment.

## III.

### A.

Nonetheless, the undisputed facts set out in the summary judgment papers show the existence of another privilege, the conditional privilege provided by subdivision 3 of section 47. Subdivision 3 provides that a privileged publication is one made, "[i]n a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or (3) who is requested by the person interested to give the information."

■ A factual assertion in a newspaper about the official conduct of a public officer, if made without malice, is within the ambit of this subdivision, for reasons set out in *Snively* v. *Record Publishing Co.* (1921) 185 Cal. 565, 571-572 [198 P. 1]. "Since the conduct of public officers in the administration of their offices is a matter in which every citizen of the community which they serve is interested, the publication in question, if otherwise privileged, must be considered as one made to persons interested, and on an occasion which would ordinarily afford reasonable grounds for supposing that it was made from innocent motives. The publication, therefore, appears to come within this part of the definition of privilege as given in subdivision 3 [of section 47]." (*Ibid.*) Such a publication is privileged even though untrue. (*Id.,* at pp. 572-576; see also *Emde* v. *San Joaquin County etc. Council* (1943) 23 Cal.2d 146, 154-155 [143 P.2d 20, 150 A.L.R. 916].)

The value of public communication, which *Snively* discerned in this reading of subdivision 3, is the same as that protected by the First Amendment

to the United States Constitution and, analogously, its cognate in article I, section 2, of the California Constitution. So much has been recognized by the United States Supreme Court. *Snively* is cited as authority for the rule of federal constitutional privilege in *New York Times Co.* v. *Sullivan, supra,* 376 U.S. at page 280, footnote 20 [11 L.Ed.2d at page 706].[2] The interrelation of these constitutional and statutory provisions has long been recognized. (See *Emde, supra,* 23 Cal.2d at pp. 154-155; *Babcock* v. *McClatchy Newspapers* (1947) 82 Cal.App.2d 528 [186 P.2d 737].) "Beginning with *Snively* [*supra*], through *Noral* v. *Hearst Publications, Inc.* (1940) 40 Cal.App.2d 348 [ ]; *Glenn* v. *Gibson* (1946) 75 Cal.App.2d 649 [ ]; *Brewer* v. *Second Baptist Church* (1948) 32 Cal.2d 791 [ ], the California courts have recognized basic fair speech principles as paramount over plaintiffs whose status might be private or public, so long as there was no malice, and the subject matter was one of public interest." (*Rollenhagen* v. *City of Orange* (1981) 116 Cal.App.3d 414, 420 [172 Cal.Rptr. 49]; contra, *Rancho La Costa, Inc.* v. *Superior Court* (1980) 106 Cal.App.3d 646 [165 Cal.Rptr. 347].)

## B.

 That brings us to the question of malice. As we have said, a libel is a "false and unprivileged publication" (§ 45) and hence the absence of a privilege is an element of the tort of libel. (See *Block* v. *Sacramento Clinical Labs, Inc., supra,* 131 Cal.App.3d at p. 389.) When the privilege is conditional the presence of the condition is an element of the privilege. The condition in the conditional privilege recognized by subdivision 3 is the absence of malice.

---

[2] By placing the reportage of official misconduct within the statutory privilege of section 47, subdivision 3, *Snively* reads the statute as advancing the values which lie at the core of the constitutional protections of a free press, the unfettered reporting of matters of public interest. (See *Williams* v. *Taylor* (1982) 129 Cal.App.3d 745, 752 [181 Cal.Rptr. 423]; *Warfield* v. *McGraw-Hill, Inc.* (1973) 32 Cal.App.3d 1041, 1047 [108 Cal.Rptr. 652]; *McCunn* v. *California Teachers Assn.* (1970) 3 Cal.App.3d 956, 960 [83 Cal.Rptr. 846].) A central purpose of the First Amendment is the protection of these values against the claims to their suppression as seditious libel, the punishment of criticism of the government by tort or crime. (See Kalven, The Negro and the First Amendment (1965) pp. 7-64.) "A free society is one in which you cannot defame the government." (*Id.,* at p. 16.) The free speech issues arise in an action in tort by a public official, aimed at the protection of the official's reputation, because the government is represented by its public officials and criticism of them *is* criticism of the government, frequently the only form of criticism which is meaningful. Since the privacy or the reputation of the public official criticized may be invaded by publication of his alleged wrongdoing in his public capacity, the temptation arises to escape the strictures of the Constitution by casting the invasion not as seditious libel (of the government) but as the libel of a person. The attempted circumvention does not escape constitutional scrutiny. "By volunteering his services for public office the official (as opposed to the ordinary employee) waives much of his right to privacy." (*Briscoe* v. *Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529, 535, fn. 5 [93 Cal.Rptr. 866, 483 P.2d 34, 57 A.L.R.3d 1].) *Snively* recognizes the threat to values protected by the Constitution in a libel action by embodying protections within the statutory privilege of subdivision 3 of section 47.

■ Malice in the law of libel is a term of legal art. (See, e.g., *Davis* v. *Hearst* (1911) 160 Cal. 143, 154-180 [116 P. 530].) Its meaning is measured against the purposes served by the privilege. With respect to the conditional privileges, malice lies in the abuse of the (otherwise) privileged occasion. (See, e.g., *Brewer* v. *Second Baptist Church* (1948) 32 Cal.2d 791, 797 [197 P.2d 713]; Rest.2d Torts, § 599.) That may occur when the purpose for the publication is not within the values protected by the privilege (2 Harper, James and Gray, The Law of Torts (2d ed. 1986) § 5.27, p. 235; see also Rest.2d Torts, § 10, subd. (2)(b), § 890, com. c., § 603: *Biggins* v. *Hanson* (1967) 252 Cal.App.2d 16, 20 [59 Cal.Rptr. 897]), as when the purpose for the publication is attributable to malice in the ordinary sense of animus or ill will toward the person libeled.

The common usage of malice as ill will is called "actual malice" in the California law of defamation. (See § 48a, subd. 4(d).) ■ Such actual malice counts as malice under section 47, subdivision 3 and defeats the privilege if it is the motivating cause of the publication. (See *Kapellas* v. *Kofman, supra,* 1 Cal.3d at p. 29.)[3]

In this case there is no evidence of such actual malice and no triable issue of such fact. The plaintiff did not respond to the showing in the summary judgment papers of a privileged purpose for defendant's publication by the production of evidence that the publication was motivated by hatred or ill will toward Officer Stewart by the newspaper or any staff member. On the contrary, Officer Stewart adduced evidence that neither Durazo nor Lopez had prior knowledge about him.[4]

■ But actual malice is not the only basis for a finding of malice which defeats the conditional privilege. As related, the key to loss of privilege is abuse of the privileged occasion. Since the privilege is given for a particular

---

[3] Regardless of ill will toward the maligned party, a publication is privileged if it is nonetheless made for a purpose advanced by the privilege. (See Rest.2d Torts, § 603, com. a; cf. *Brewer* v. *Second Baptist Church, supra,* 32 Cal.2d at p.797; *Kapellas, supra,* 1 Cal.3d at p. 29; see generally § 48a, subd. 4(d).) "The fact that the defendant was actuated by indignation or disgust or other feelings not inconsistent with an honest desire to protect his own or another's interests will not conclusively establish malice." (2 Harper, James and Gray, *supra,* § 5.27, p. 235, fn. omitted; also see Rest.2d Torts, § 603, com. a; *Williams* v. *Taylor, supra,* 129 Cal. App.3d at pp. 752-753; *Biggins* v. *Hanson, supra,* 252 Cal.App.2d at pp. 20-21.) A publication is attributable to a proper purpose, regardless of such actual malice, if it would have occurred in any event in the pursuit of the proper purpose. (See generally, *Miller* v. *Chico Unified School Dist.* (1979) 24 Cal.3d 703, 715 [157 Cal.Rptr. 72, 597 P.2d 475]; *Martori Brothers Distributors* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 721, 729-731 [175 Cal.Rptr. 626, 631 P.2d 60].)

[4] Evidence of hatred or ill will on the part of the newspaper would have been relevant to the issues raised by the claim of First Amendment privilege. Nonetheless, plaintiff made no such claim and tendered no such evidence and, in fact, adduced contrary evidence (lack of prior knowledge of Stewart), compelling the conclusion that there is no such evidence. (See *Constance B.* v. *State of California* (1986) 178 Cal.App.3d 200, 211 [223 Cal.Rptr. 645].)

purpose, abuse of the privilege occurs when the publication is attributable to "any cause other than the desire to protect the interest for the protection of which the privilege is given." (*Brewer* v. *Second Baptist Church, supra,* 32 Cal.2d at p. 797.) The privilege of the press to publish reports of official misconduct under section 47, subdivision 3 is given to advance the interest of informing the public in the pursuit of its constitutionally recognized responsibility of overseeing government. (*Snively, supra,* 185 Cal. at pp. 571-572.) That leads to the question: What else, other than hatred or ill will, shows that a report of official misconduct was not made to inform the public?

The answer is that the publication is attributable to an improper purpose when the purpose of informing the interested party does not account for the behavior of the publisher. Ordinarily an abuse of the privileged occasion is made out when it is shown that the publisher did not believe that the injurious statement was true. Even if the publisher has such a belief, an abuse may be shown if there are no reasonable grounds, no probable cause for the belief. (See, e.g., *Snively, supra,* 185 Cal. at pp. 576-578; Rest.2d Torts, § 600.) The apparent logic in this reasoning is that ordinarily a purpose to inform an interested person would not be the reason for a knowing lie or for making a damaging assertion without reasonable backing.

However, the law recognizes that this logic is inapplicable in circumstances in which the purpose to inform exists notwithstanding an absence of belief in the truth of the matter reported. Thus an exception from the requirement for such belief arises in the case "where the protection of the interest involved may make it reasonable to report rumors or statements that the publisher may even know are false . . . ." (*Brewer, supra,* 32 Cal.2d at p. 797; also see, e.g., Rest.2d Torts, § 602.)

The conditions for such a case are set forth in Restatement Second of Torts section 602. "One who upon an occasion giving rise to a conditional privilege publishes a defamatory rumor or suspicion concerning another does not abuse the privilege, even if he knows or believes the rumor or suspicion to be false, if [¶] (a) he states the defamatory matter as a rumor or suspicion and not as fact, and [¶] (b) the relation of the parties, the importance of the interests affected and the harm likely to be done make the publication reasonable."

The pertinent considerations are elaborated in the comments to Restatement Second of Torts section 602. The value of the interest sought to be protected by the communication must be weighed against the likely damage of the assertion, if false. "If the interest that [the publisher] reasonably believes to be in danger is of great value and if the harm that he reasonably

believes is threatened to it is a serious one, he may be justified in communicating defamatory imputations that are not supported by evidence sufficient to justify belief in their truth." (*Id.*, com. b.) As to likely damage, that consideration is mitigated if the context is one where the charge will likely lead to an investigation prior to prejudicial action. (*Ibid.*) Where publication is called for the publisher "must not mislead . . . to the disadvantage of the person defamed by communicating as facts within his own knowledge matter that is only hearsay." (*Ibid.*)

■ This case facially meets the criteria for privilege to publish despite the absence of belief by the publisher in the truth of Miles's account of misconduct. The interest of the public in learning of misconduct by government officials in the conduct of public business is highly valued.[5] Such reports are unlikely to lead to action prejudicial to the officer without a further investigation.

The damaging account here is attributed to an identified percipient witness and is accompanied by the particularized denials of the officer who is alleged to have acted improperly. Given the relation of the newspaper to its citizen readers, the value of public airing of an alleged official impropriety by means of reasonably accurate and attributed reportage outweighs the prospects of harm to the reputation of the public official who is the subject of the report. Hence, we hold such an account is facially within the privilege of section 47, subdivision 3.[6]

The evidence in these summary judgment proceedings, viewed in the light most favorable to Officer Stewart, is equivocal on the question whether the newspaper believed in the truth of the damaging assertions of Miles. However, in these circumstances such a belief is not required. This is a case where protection of the interest of the public in learning of misconduct of a public official makes it reasonable for the newspaper to publish Miles's claims of misconduct despite the absence of belief that his version of the incident is true.

Stockton Newspapers has not adopted Miles's charge as its own and the issue of truthfulness is material only to the legal *duty* of a newspaper to

[5] An example of the application of Restatement Second of Torts, found in illustration (1) of the comments to section 602, is informing another about a rumor concerning the honesty of his servant. Public officials are public servants and their ultimate employer is the public.

[6] It has been suggested that there is or should be a somewhat analogous doctrine within the federal constitutional privilege. (See *Edwards* v. *National Audubon Society, Inc.* (2d Cir. 1977) 556 F.2d 113, 120; but cf. *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 388-392 [41 L.Ed.2d 789, 833-835, 94 S.Ct. 2997] (dis. opn of White, J.); also see, e.g., Comment, *Constitutional Privilege to Republish Defamation* (1977) 77 Colum.L.Rev. 1266; Note, *Libel and the Reporting of Rumor* (1982) 92 Yale L.J. 85; see generally Annot., Defamation: Publication of "Letter to Editor" in Newspaper as Actionable (1980) 99 A.L.R.3d 573.)

*resolve* the issue of truthfulness. The newspaper account is presented as an unresolved controversy. Where reportage attributes the charge of official impropriety to a third person, the bare absence of a belief in the charge does not give rise to an inference of malice. Otherwise, in every such case a newspaper would be under a duty to resolve the truthfulness of a controversy at the peril of a libel action should its resolution later prove faulty. Thus, mere skepticism concerning the truth of a charge of official misconduct does not afford an inference of malice.

Nonetheless, such a report must be substantially accurate. If the facts are "exaggerated, overdrawn, or colored to the detriment of the plaintiff, or are not stated fully and fairly with respect to the plaintiff," the privilege may be lost. (See *Snively, supra,* 185 Cal. at p. 578.) Where the gist of a stinging account of a charge of official impropriety is accurate, the fact that the presentation could have been more evenhanded does not amount to malice in law. This rule has been recognized in similar contexts as necessary to prevent analogous privileges from being defeated by such collateral claims. (See, e.g., *Reader's Digest Assn.* v. *Superior Court* (1984) 37 Cal.3d 244, 262, fn. 13 [208 Cal.Rptr. 137, 690 P.2d 610].) With these principles in mind we determine whether there are triable issues of material fact concerning the privilege of section 47, subdivision 3.

## IV.

 We note again the utter absence of evidence of preexisting hatred or ill will by Stockton Newspapers or any of its agents toward Stewart. There is no reason to suppose that the published account was contrived or fabricated to further some personal vendetta. The absence of any indication that there may be facts evidencing an ulterior motive precludes denial of summary judgment on the theory that such facts, "essential to justify opposition may exist but cannot [yet] be presented." (Code Civ. Proc., § 437c, subd. (h).)

Stewart relies on the fact that neither Durazo or Lopez unequivocally believed in the truth of all of Miles's charges. Although each recalls reservations concerning whether Miles's account was true, as we have explained, this is immaterial. Since they did not endorse Miles's version as the truth, they need not have had a belief that it was more probably true than false. It suffices that they were not convinced the charge was false and that they perceived the controversy as newsworthy. As related, publication of an attributed account of alleged official impropriety, in the performance of the ordinary business of the press, does not amount to legal malice.

Stewart protests that Miles's account is "inherently" incredible. That is not a ground upon which the privilege to publish the attributed report may

be defeated. Were the account too farfetched to permit anyone to credit it as possibly true it could not have damaged Stewart's reputation.

Stewart claims the publication is not privileged because the account is inaccurate. But none of the claimed inaccuracies raise a triable issue of material fact because they do not materially advance or enhance the sting of the account. Stewart acknowledges that the sting of the alleged libel is the claim he wrongfully coerced a mentally retarded person into a confession to murder. None of the claimed inaccuracies in the presentation of the account significantly enhances the sting. We discuss the foremost two of the claims as representative examples.

Stewart argues that the article is materially distorted by Lopez's sentimental prologue concerning the "three strikes against" Miles when Stewart came to his door. Each of the factors Lopez proffered as a disadvantage was present as he asserted. The only potential falsehood is the assertion that Miles was aware of these disadvantages. Regardless of Miles's state of mind, the prologue does not materially aid the thrust of the damaging account. The prologue does tend to foreshadow a conclusion that an injustice has been visited upon Miles. However, the provocative emotive chord is merely an entree to the balanced material factual assertions contained in the article. Moreover, it is too much to expect, nor does the law require, forensic evenhandedness from popular writers who must strive not to bore their readers. (See *Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at pp. 261-265.)

Stewart claims inaccuracy in the second sentence, "Miles, 19, was questioned about and then confessed to a murder he didn't commit." Stewart argues that this is a material distortion because, under his version of the incident, Miles confessed during a telephone conversation and merely confirmed this confession when interrogated. This is a quibble; it furnishes not the slightest support for a finding of malice. A confession is no less a confession the second time around. Moreover, the article reports Stewart's claim that Miles had admitted involvement in the shooting in a telephone conversation which preceded his interrogation.

Stewart's other claims of collateral inaccuracy are no more persuasive and do not warrant, singly or in the aggregate, textual discussion. On this record there is no triable issue of material fact regarding inaccuracy. The account of the controversy presented in the article conveys the available information concerning the arrest and incarceration of Miles with substantial accuracy. Nothing that was included is unsubstantiated; nothing that is claimed to have been omitted would significantly alter the existing balance of credibility concerning the controversy in Stewart's favor.

Stewart's remaining category of claim is that a finding of malice may be grounded on the failure of Durazo to take his suggestions for further investigation prior to publication of the article. ▮ Failure to investigate a claim of misconduct is a weaker variant of the claim of distortion by detrimental coloration or knowing omission, matters we have previously discussed. It might be called distortion by inaction. It is weaker because it posits an affirmative duty upon the publisher to take action to discover supposed further facts. The imposition of such a duty could severely hinder the free flow of discourse concerning the conduct of public officials which it is a policy of the privilege to protect. Accordingly, it may not alone form the basis of an inference of malice.

The wiser rule derives from the related privilege arising under the federal constitutional law. "Failure to investigate, without more, does not demonstrate actual malice." (*Marcone* v. *Penthouse Intern. Magazine for Men* (3d Cir. 1985) 754 F.2d 1072, 1089; see also *Coughlin* v. *Westinghouse Broadcasting and Cable* (E.D.Pa. 1985) 603 F.Supp. 377, 387 ("Evidence of failure to investigate, even if it establishes that defendant was indifferent to the truth of an allegedly defamatory communication, is . . . insufficient to show that defendant acted with malice").) Likewise, "[m]ere negligence in investigation by a reporter . . . do[es] not alone rise to the level of reckless disregard." (*Roberts* v. *Dover* (M.D.Tenn. 1981) 525 F.Supp. 987, 993.) In keeping with purposes served by the privilege, we import this rule into section 47, subdivision 3.

▮ To show the difficulties which would accompany an attempt to saddle the press with a legal duty to investigate, it should be said that the further investigation suggested by Stewart would not have resolved the controversy. Stewart complains that Durazo failed to read the police report he had prepared, which states that Miles called the police department, spoke with plaintiff, and admitted being involved in the shooting of Arcus Brown. But this sheds no new light. The report was prepared by Stewart. Durazo had interviewed Stewart and obtained his version of the facts surrounding the arrest and interrogation of Miles. Consequently, the statements in the report would merely be cumulative to the information obtained during the interview.

Stewart also complains that Durazo failed to read and consider a psychiatrist's report, which concludes that Miles's confession may not be true because he "seems to be easily overloaded and upset and may say a number of things under the pressure of the interview or pressure of the moment." However, Durazo was already aware that Miles was susceptible to pressure and had made untrue statements during his interrogation. Any material Durazo could have gleaned from the psychiatrist's report would also have been cumulative. Even if failure to adequately investigate were material in

some theoretical circumstances, there is no basis to infer that failure to investigate was a cause of harm to Stewart. For all the foregoing reasons we conclude that no triable issue of fact regarding malice is raised by the claim that Durazo failed to conduct an adequate investigation.

### Disposition

All of the papers submitted show that there is no triable issue of material fact regarding the defense of privilege under section 47, subdivision 3. The petition has been served on respondent court and plaintiff. Having advised the parties that we were considering issuing a peremptory writ without first issuing an alternative writ, and having thereafter received further opposition to the petition, this court is empowered to issue a peremptory writ of mandate in the first instance. (*Palma* v. *U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171 [203 Cal.Rptr. 626, 681 P.2d 893]; *St. Paul Fire & Marine Ins. Co.* v. *Superior Court* (1984) 161 Cal.App.3d 1199, 1201 [208 Cal.Rptr. 5].)

Let a peremptory writ of mandate issue directing respondent superior court to vacate its order denying defendant's motion for summary judgment and to enter a new order granting the motion. Upon this decision becoming final, the stay previously issued is vacated.

Carr, J., and Sparks, J., concurred.