[No. S005126. Apr. 27, 1989.]

SHIRLEY BROWN, Plaintiff and Appellant, v.
KELLY BROADCASTING COMPANY et al., Defendants and
Respondents.

714

**Counsel**

Brenton A. Bleier and Kitt N. Berman for Plaintiff and Appellant.

Charles O. Morgan, Jr., and Paul Kleven as Amici Curiae on behalf of Plaintiff and Appellant.

L. Thomas Wagner, Anthony D. Lauria, Sara A. Clark and Weintraub, Genshlea, Hardy, Erich & Brown for Defendants and Respondents.

Gibson, Dunn & Crutcher, Robert S. Warren, Rex S. Heinke, Kelli L. Sager, Gary B. Pruitt, William A. Niese, Glen A. Smith, Harold W. Fuson, Jr., Donald L. Zachary, Kaye, Scholer, Fierman, Hays & Handler, Pierce O'Donnell, Cruz Reynoso, Clara A. Zazi Pope, Donovan, Leisure, Newton & Irvine, Stephen G. Contopulos, Pillsbury, Madison & Sutro, Jerome C. Dougherty, Bernard Zimmerman, Celeste Phillips, Cooper, White & Cooper, Neil L. Shapiro, Karl Olson, Robert D. Sack, Howard B. Soloway, Rogers & Wells, Richard N. Winfield, Diana Boenig Cavanaugh, Thomas P. Newell, Cornell Chulay, George Freeman, Alice Neff Lucan, Jean E. Zoeller, Sabin, Bermant & Gould, Ralph P. Huber, Jerry Birenz, Margaret C. Crosby, Alan L. Schlosser, Edward M. Chen, Matthew A. Coles, Carol

Sobel, Brian S. Haughton and Ellman, Burke & Cassidy as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**EAGLESON, J.—** ■■■ The sole issue in this case is whether Civil Code section 47, subdivision 3, affords a broad privilege, sometimes referred to as a "public-interest privilege," to the news communications industry (news media) to make false statements regarding a private individual.[1]

Section 47(3) provides a privilege to communications made without malice on occasions in which the speaker and the recipient of the communication share a common interest. Defendants (a television station and its reporter) and several amici curiae argue that when the news media publish and broadcast matters of public interest they have a common interest with their audiences and that the publications and broadcasts should be privileged under section 47(3). Under that privilege, the plaintiff in a defamation action would be required to prove malice by the news media defendant to recover compensatory damages.

As we will explain, there is no such privilege for the news media under section 47(3). We hold that a publication or broadcast by a member of the news media to the general public regarding a private person is not privileged under section 47(3) regardless of whether the communication pertains to a matter of public interest. Thus, a private-person plaintiff is not required by section 47(3) to prove malice to recover compensatory damages.

### FACTS

Defendant Kelly Broadcasting Company (Kelly) owns and operates KCRA-TV, a television station broadcasting on Channel 3 in Sacramento. Defendant Brad Willis (Willis) was employed by Kelly as a reporter and appeared on Channel 3 programs. Willis narrated two stories in May 1984 concerning plaintiff on "Call 3 for Action" (Call 3), a consumer affairs segment of KCRA's daily news show. The stories were about two homeowners who had received home improvement loans made by the federal government and administered by the Sacramento Housing and Redevelopment Agency (SHRA). One of the homeowners, Lawson, had entered into a home improvement contract with plaintiff Brown, a licensed contractor.

---

[1] All statutory references are to the Civil Code unless indicated otherwise. For convenience, we will refer to section 47, subdivision 3, as section 47(3).

In the first broadcast, Willis claimed that Lawson was the victim of a failure of the SHRA to correct mistakes made by plaintiff in remodeling Lawson's home. Willis alleged that Lawson had suffered through "a series of warped doors, and is still left with peeling paint, cracking plaster, blistered wallpaper, shoddy work, inside and out." The story included pictures of various problems including bubbling and peeling wallcovering, peeling paint, cracked plaster, and faulty doors. Willis asserted that Call 3 had attempted to call plaintiff to discuss the remodeling problems but that she had not returned the calls. He also said that plaintiff had returned $225 to Lawson and had been released by SHRA from further responsibility for the remodeling.

In the second broadcast, another contractor who had been criticized in the first story defended his remodeling work. Willis claimed in the second broadcast that plaintiff had been given the same opportunity to defend herself but had refused to do so.

After serving a written demand for a retraction on Kelly, which it rejected, plaintiff filed suit against Kelly and Willis alleging slander per se, negligence, and malice. Defendants responded with a motion for summary judgment. In opposition, plaintiff submitted a declaration stating that KCRA had not attempted to contact her, that the allegations of substandard work were false, that much of it was done by other contractors, and that the Contractor's State License Board had told KCRA before the broadcasts that the board would not investigate Lawson's complaints against plaintiff because there was no factual support for them.

The trial court sustained defendants' evidentiary objections to portions of plaintiff's opposition and granted defendants' motion for summary judgment on the grounds that the broadcasts were conditionally privileged under section 47(3) and that plaintiff had failed to raise a triable issue of material fact as to whether the privilege was overcome by defendants' malice.

The Court of Appeal reversed the judgment. The court agreed with the trial court that section 47(3) afforded a conditional privilege to the broadcasts, thus requiring plaintiff to prove malice, but found sufficient evidence to raise a triable issue of material fact as to whether defendants had acted with malice.

We affirm the Court of Appeal's judgment, but we do so not because there is a triable issue as to malice but because the broadcasts are not subject to a privilege under section 47(3).

## DISCUSSION

*The broad public-interest privilege claimed under section 47(3) is not constitutionally mandated or appropriate.*

 In recent years, the common and statutory law of defamation has been supplanted in many respects by decisions of the United States Supreme Court construing the federal Constitution. Thus, although the question before us can be answered by statutory construction, it is best understood in light of the high court's decisions. Defendants do not contend those decisions mandate a privilege under section 47(3) but argue that they provide policy support for a statutory public-interest privilege for the news media under section 47(3). We disagree. The United States Supreme Court has construed the federal Constitution as imposing certain limitations on plaintiffs seeking to recover for defamation. The high court, however, has expressly rejected the privilege sought by defendants in this case.

For approximately 175 years after the First Amendment to the federal Constitution was ratified, libelous statements were afforded no constitutional protection.[2] The law of defamation was almost exclusively the business of state courts and legislatures. (Eldredge, The Law of Defamation (1978) § 50, pp. 252-254 (hereafter Eldredge).) The court did not squarely hold until 1931 that the First Amendment applies to the states by reason of the Fourteenth Amendment. (*Stromberg* v. *California* (1931) 283 U.S. 359, 368-369 [75 L.Ed. 1117, 1122-1123, 51 S.Ct. 532, 73 A.L.R. 1484].) As recently as 1957, the court reiterated that, "[T]he unconditional phrasing of the First Amendment was not intended to protect every utterance. This phrasing did not prevent this Court from concluding that libelous utterances are not within the area of constitutionally protected speech." (*Roth* v. *United States* (1957) 354 U.S. 476, 483 [1 L.Ed.2d 1498, 1506, 77 S.Ct. 1304], citing *Beauharnais* v. *Illinois* (1952) 343 U.S. 250, 266 [96 L.Ed. 919, 932, 72 S.Ct. 725].)

Only seven years later, however, the court found for the first time that libel is protected by the federal Constitution under certain circumstances. In *New York Times* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412], the court held that "The constitutional guarantees [of freedom of speech and the press] require . . . a federal rule that prohibits *a public official* from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that

---

[2]The First Amendment, ratified as part of the Bill of Rights in 1791, states, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." (*Id.*, at pp. 279-280 [11 L.Ed.2d at p. 706], italics added.)[3] Although the *New York Times* restriction applied only to public officials, by finding constitutional protection for defamation, the court "effected a profound change in the hitherto settled law of defamation and overruled the prior common law of practically every state." (Eldredge, *supra,* § 51, p. 255.)

■ Shortly after *New York Times, supra,* 376 U.S. 254, the court further restricted the common law of defamation by holding that "public figures"—like public officials—must also prove malice under the *New York Times* standard to recover for defamatory criticism. ■ ■ ■ ■ (*Curtis Publishing Co.* v. *Butts* (1967) 388 U.S. 130, 162-165 [18 L.Ed.2d 1094, 1115-1117, 87 S.Ct. 1975] (conc. opn. of Warren, C. J.).)[4]

The *New York Times* privilege was taken one step further in *Rosenbloom* v. *Metromedia* (1971) 403 U.S. 29, 52 [29 L.Ed.2d 296, 316-317, 91 S.Ct. 1811], in which a plurality of the court concluded the malice standard should extend to defamatory falsehoods *relating to private* persons if the statements concerned matters of general or public interest. That is essentially the same conclusion defendants ask us to reach in this case.

*Rosenbloom, supra,* 403 U.S. 29, however, was short lived. In *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323 [41 L.Ed.2d 789, 94 S.Ct. 2997], a majority of the court soundly rejected the "general or public interest" test adopted by the *Rosenbloom* plurality for defamation actions by private persons. The court reaffirmed its support for the *New York Times* standard of liability but concluded that, "the state interest in compensating injury to the reputation of private individuals requires that a different rule should obtain with respect to them." (*Gertz, supra,* 418 U.S. 323, 343 [41 L.Ed.2d 789, 807].) ■ The court stated that, "so long as they do not impose liability without fault, the States may define for themselves the appropriate

---

[3] The court subsequently equated reckless disregard of the truth with subjective awareness of probable falsity. "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." (*St. Amant* v. *Thompson* (1968) 390 U.S. 727, 731 [20 L.Ed.2d 262, 267, 88 S.Ct. 1323].)

[4] Because plaintiff in the present case is not alleged to be a "public figure," we need not discuss the court's explanations of that term in *Curtis* and subsequent cases. It is sufficient to note that, ". . . a court must focus on the 'nature and extent of an individual's participation in the particular controversy giving rise to the defamation.' . . . A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." (*Wolston* v. *Reader's Digest Assn., Inc.* (1979) 443 U.S. 157, 167 [61 L.Ed.2d 450, 460, 99 S.Ct. 2701]; *Reader's Digest Assn.* v. *Superior Court* (1984) 37 Cal.3d 244, 254, fn. 6 [208 Cal.Rptr. 137, 690 P.2d 610].)

standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." (*Id.,* at p. 347 [41 L.Ed.2d at p. 809].)[5]

■ Thus, *Gertz* holds that the public-interest privilege advocated by defendants under section 47(3) is not required by the federal Constitution. Moreover, *Gertz* refutes defendants' policy argument that federal constitutional protections for freedom of the press weigh in favor of creating a public-interest privilege in defamation actions by private-figure plaintiffs. The *Gertz* court carefully balanced the competing values of society's interest in a free press and society's need to prevent and redress attacks on reputation and found that a public-interest privilege is not constitutionally required.

*The language of section 47(3) does not support a broad public-interest privilege for the news media.*

Defamation has two forms—libel and slander. (§ 44.) Each is statutorily defined as "a false and *unprivileged* publication." (§ 45 [libel] and § 46 [slander], italics added.)[6] Section 47(3) provides a privilege to specified communications made "without malice." ■ For purposes of section 47(3), malice has been defined as "a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy or injure another person." (*Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 944 [160 Cal.Rptr. 141, 603 P.2d 58].) ■ ■ ■ ■ If section 47(3) applies to the occasion on which a communication is made *and* if it was made without malice, it is privileged and cannot constitute a defamation under California law.[7]

---

[5] As we will explain, since *Gertz* the overwhelming majority of states have decided that a private individual need show only negligence. (See pp. 740-742, *post.*)

[6] For purposes of defamation law, the definition of "publication" is not restricted to widely disseminated materials such as magazines and newspapers. "It is not necessary that the defamatory matter be communicated to a large or even a substantial group of persons. It is enough that it is communicated to a single individual other than the one defamed." (Rest.2d Torts, § 577, com. *b,* p. 202.)

[7] We believe it necessary to resolve some minor confusion that has arisen in prior cases as to terminology in defamation cases and the relationship between malice and privilege. First, because defamation is statutorily defined as an *unprivileged* communication, it is incorrect terminology under California law to refer to a "privileged defamation" or to a "privilege to defame." Second, the privilege under section 47(3) has usually been referred to as a qualified or conditional privilege, meaning that it can be overcome by a showing of malice. (See generally 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 519, p. 609.) This characterization is somewhat misleading. Section 47(3) *defines* a privileged communication as one made without malice. Thus, if malice is shown, the privilege is not merely overcome; it never arises in the first instance. Third, the characterization of the privilege as qualified or conditional is incorrect to the extent that it suggests the privilege is defeasible. It is *the occasion* giving rise to the publication that is conditionally privileged, i.e., under specified conditions the occasion gives rise to a privilege. If the privilege arises, it is a complete defense. (Eldredge, *supra,* § 83, pp. 448-450.)

With this understanding of how section 47(3) operates, we turn to the issue of whether it provides a special public-interest privilege to the news media.[8] ■ We begin with the fundamental rule that our primary task in construing a statute is to determine the Legislature's intent. (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].) ■ "The court turns first to the words themselves for the answer." (*People* v. *Knowles* (1950) 35 Cal.2d 175, 182 [217 P.2d 1]; *Committee of Seven Thousand* v. *Superior Court* (1988) 45 Cal.3d 491, 501 [247 Cal.Rptr. 362, 754 P.2d 708].) Section 47 states: "A privileged publication or broadcast is one made . . . [¶] 3. In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or (3) who is requested by the person interested to give the information."

■ The statutory language contains no reference to a "*public* interest" or any *special* privilege for the news media. If the Legislature had intended to create a broad public-interest privilege for the news media, the Legislature could easily have done so in reasonably clear language.

Although not dispositive, the language of other subdivisions of section 47 suggests the Legislature did not intend such a privilege. Subdivision 4 grants a privilege to "a fair and true report *in a public journal*" of judicial, legislative, and other official proceedings. (Italics added.) Thus, subdivision 4 depends in part on the status of the publisher, i.e., being a public journal. The omission from subdivision 3 of any reference to public journals, coupled with such a reference in subdivision 4, suggests the Legislature did not intend subdivision 3 to provide a special privilege to communications by the news media based on their status. Similarly, subdivision 5 grants a privilege to "a fair and true report" of a public meeting if "the publication of the matter complained of was for *the public benefit*." (Italics added.) Subdivision 3, by contrast, does not at any point refer to the public benefit or any similar concept, including the public interest.[9]

---

[8] By "news media," a term we use for convenience, we mean those persons and entities that broadcast or publish matters of current events to the public at large. We make no judgment as to what constitutes news or as to who is a member of the news media.

[9] Section 47, subdivisions 4 and 5, state in their entirety: "A privileged publication or broadcast is one made . . . [¶] 4. By a fair and true report in a public journal, of (1) a judicial, (2) legislative, or (3) other public official proceeding, or (4) of anything said in the course thereof, or (5) of a verified charge or complaint made by any person to a public official, upon which complaint a warrant shall have been issued. [¶] 5. By a fair and true report of (1) the proceedings of a public meeting, if such meeting was lawfully convened for a lawful purpose and open to the public, or (2) the publication of the matter complained of was for the public benefit."

The differences are illustrative. "It is a well recognized principle of statutory construction that when the Legislature has carefully employed a term in one place and has excluded it in another, it should not be implied where excluded." (*Ford Motor Co.* v. *County of Tulare* (1983) 145 Cal.App.3d 688, 691 [193 Cal.Rptr. 511]; see generally 2A Sutherland, Statutory Construction (4th ed. 1984 rev.) § 47.23, p. 194.) If the Legislature had intended subdivision 3 to apply to the news media as such or to communications on matters of public interest, the Legislature could have used the same clear language as in subdivisions 4 and 5.[10]

 Most important, the privilege sought by defendants would be so broad that it would apply to almost every defamatory communication. Presumably, the news media generally publish and broadcast only matters that the media believe are of public interest, and the media defendant in every defamation action would therefore argue that the communication was a matter of public interest. We think it would be a rare case in which a media defendant would contend that its viewers or readers were not interested in the communication or that the defendant itself was not also interested.[11] Thus, the practical result sought by the news media would be that nearly everything they publish and broadcast would be privileged. A privilege is an exception to a general rule of liability, but under defendants' view of section 47(3), the privilege would be the general rule for the news media and liability would be the exception. We believe the Legislature would have made clear its intention for such a drastic restriction on the common law of defamation, especially because the statute was enacted when strict liability was the standard of fault for defamation actions. (See discussion at pp. 726-727, *post.*)

The statutory language does not suggest the broad public-interest privilege claimed by defendants. To the contrary,

---

[10] In 1945, the Legislature amended section 47 to extend the section to broadcasts as well as publications. (Stats. 1945, ch. 1489, § 3, p. 2763.) Defendants incorrectly contend this amendment reflects a legislative intent to create a broad public-interest privilege under section 47(3). They reason that the term "publication," as used in the original statute, was a narrow legal term referring to the act of communicating false information, whether to one recipient or many. (See discussion at p. 723, fn. 6, *ante.*) Defendants contend the addition of the word "broadcast" to the statute was meant to make clear that section 47(3) applies to mass media communications in the public interest. We disagree. That amendment does not suggest any special privilege for the news media. As defendants acknowledge, the term "publication," as used in the original statute, was a term of art in defamation law and did not necessarily refer to newspapers and periodicals. Thus, the Legislature's use of the term "publication" in section 47(3) is little, if any, support for the view that the Legislature intended to create a privilege for the news media. It is therefore unreasonable to assume the Legislature intended a broad expansion of section 47(3) with the seemingly minor insertion of the word "broadcast."

[11] Section 47(3) requires that a privileged communication be both "to a person interested therein" *and* "by one who is also interested."

subdivision 3, and section 47 as a whole, show that no such privilege was contemplated by the Legislature.[12]

*Legislative history confirms that section 47(3) is narrow in scope.*

Although we need not look beyond the clear language of the statute, we find strong support for our conclusion in the legislative history of section 47(3). It was enacted as part of the Civil Code in 1872.[13] At that time, in the common law of England and the United States, defamation was subject to strict liability, that is, liability without fault as to truth or falsity. (Eldredge, *supra,* § 5, pp. 14-25; Prosser & Keeton, The Law of Torts (5th ed. 1984) § 113, p. 804.) The standard of liability was succinctly phrased in Lord Mansfield's often quoted statement that, "Whenever a man publishes he publishes at his peril." (*The King* v. *Woodfall* (1774) Loftt 776, 781 [98 Eng. Rep. 914, 916].) Justice Holmes subsequently stated the rule in equally clear

---

[12] Defendants contend we must construe section 47(3) to provide a public-interest privilege for the news media to preserve the constitutionality of sections 45 and 46, which define defamation. Defendants reason that those sections, which were enacted when strict liability was the rule, do not contain language that requires a showing of fault and that, if a news media communication is not privileged under section 47(3), the publisher or broadcaster would be subject to strict liability. *Gertz, supra,* 418 U.S. 323, 347 [41 L.Ed.2d 789, 809], however, abrogated the states' ability to impose liability without fault. Thus, defendants argue that we can preserve the constitutionality of sections 45 and 46 only by finding a news media public-interest privilege in section 47(3).

The public-interest privilege advocated by defendants would not eliminate the inconsistency between *Gertz* and sections 45 and 46. Within the statutory framework, news media communications on matters that are not of public interest would remain subject to the strict liability standard of sections 45 and 46. This result, of course, would conflict with *Gertz,* which precludes strict liability for any communication by the news media. Thus, the inconsistency between *Gertz* and sections 45 and 46 would remain to some extent even if we were to adopt the public-interest privilege advocated by defendants. The only way to eliminate the inconsistency would be to find a privilege in section 47(3), for *all* news media communications, regardless of the nature of the communication. Such result would be even broader than that sought by defendants, who have argued only for a privilege for matters of public interest.

Second, it is facile to argue that sections 45 and 46 are unconstitutional under *Gertz* unless there is a privilege under section 47(3). To the extent that sections 45 and 46 formerly allowed strict liability, they were effectively amended *in that regard* the day *Gertz* was decided. In the 15 years since then, it has been clear that strict liability is no longer the rule for news media communications. What defendants implicitly ask us to do is to rewrite the defamation statutes to make clear that liability cannot be imposed without fault. That is already clear under *Gertz.* If, however, there is a "housekeeping" need for the statutes to be modernized to conform to *Gertz,* the Legislature is the appropriate forum for such rewriting. We decline defendants' invitation to adopt a convoluted interpretation of section 47(3) for the purported purpose of saving the constitutionality of sections 45 and 46, especially when there has been no difficulty to date in properly applying those sections under *Gertz.*

[13] Although section 47(3) has been amended over the years since its enactment, there are no significant substantive differences between the present version and the original statute, which stated, "A privileged publication is one made: . . . [¶] 3. In a communication, without malice, to a person interested therein, by one who was also interested, or who stood in such a relation to the former as to afford a reasonable ground for supposing his motive innocent, or who was requested by him to give the information; . . ."

fashion: "If the publication was libellous the defendant took the risk." (*Peck v. Tribune Co.* (1909) 214 U.S. 185, 189 [53 L.Ed. 960, 962, 29 S.Ct. 554]; "libellous" is now archaic spelling.)

To ameliorate the harshness of the strict-liability standard, certain privileges and defenses developed in the common law. The one that is most relevant to the question before us is the common-interest privilege, which protected communications made in good faith on a subject in which the speaker and hearer shared an interest or duty. This privilege applied to a narrow range of private interests. The interest protected was private or pecuniary; the relationship between the parties was close, e.g., a family, business, or organizational interest; and the request for information must have been in the course of the relationship. (*Rancho La Costa, Inc.* v. *Superior Court* (1980) 106 Cal.App.3d 646, 664-665 [165 Cal.Rptr. 347] [describing limited nature of privilege]; see, e.g., *Brewer* v. *Second Baptist Church* (1948) 32 Cal.2d 791, 796 [197 P.2d 713] [recognizing that a privilege ordinarily exists for communications among church members]; Cate, *Defining California Civil Code Section 47(3): The Resurgence of Self-Governance* (1987) 39 Stan.L.Rev. 1201, 1204-1205 (hereafter Cate).)

The legislative history of section 47(3) indicates the Legislature intended to codify the narrow common law privilege of common interest, not to create any broad news-media privilege. We find special significance in *Wilson* v. *Fitch* (1871) 41 Cal. 363, which we decided only one year before section 47(3) was enacted. The plaintiff was an owner of a mining corporation; defendants were the editors of a general circulation newspaper that had published an article suggesting financial wrongdoing by the corporation towards its investors. In response to a libel suit, the defendants contended their article was privileged because ". . . it was published by public journalists as a matter of general and peculiar public interest, and related to the conduct of the plaintiff . . . ." (*Id.,* at p. 382.) We squarely rejected this argument: "Nor can a defamatory publication in a public journal be said to be privileged *simply because it relates to a subject of public interest,* and was published in good faith, without malice, and from laudable motives. No adjudicated case, that I am aware of, has ever gone so far." (*Id.,* at pp. 382-383, italics added.) We noted a "due regard to the freedom of the press" but explained that the privilege sought by the newspaper would result in "little security for private character." (*Id.,* at p. 383.)

In light of *Wilson, supra,* 41 Cal. 363, the Legislature surely would have made clear any intent to create thereafter a broad public-interest privilege in section 47(3) for the news media. ■ " 'It is a generally accepted principle that in adopting legislation the Legislature is presumed to have had knowledge of existing domestic judicial decisions and to have enacted and

amended statutes in the light of such decisions as have a direct bearing on them.'" (*Estate of McDill* (1975) 14 Cal.3d 831, 839 [122 Cal.Rptr. 754, 537 P.2d 874], quoting *Buckley* v. *Chadwick* (1955) 45 Cal.2d 183, 200 [288 P.2d 12].) The Legislature could have created the privilege sought by defendants either by the language of the statute (the most likely and better approach) or by a disapproving reference to *Wilson*. The Legislature did neither.

■ We also find significance in the drafters' comments to section 47(3). The wording of section 47(3) was identical to that of section 31 of the original New York Civil Code published in 1865 as a codification of the common law (N.Y. Civ. Code, § 31 (Field 1865)). In the comments following section 47(3), its drafters cited two New York cases dealing with the common-interest privilege. (Cal. Civ. Code Ann., § 47 annotation (Haymond & Burch 1872).) Neither involved a privilege even remotely similar to that claimed by defendants in the present case.

The first case cited was *Lewis and Herrick* v. *Chapman* (1857) 16 N.Y. 369. A banker had received for collection from a mercantile house a note payable at the bank and drawn by plaintiffs. When the banker remitted payment for the note he informed the payee in a confidential letter that payment had been as an accommodation to the plaintiffs, suggesting that they had insufficient funds to pay the note. The court found the communication privileged on the ground that a banker entrusted by a creditor with the collection of the note has a privilege to inform the holder of the note of the inability of the maker to pay at maturity. (*Id.,* at p. 375.) The common interest involved was private and pecuniary. No news report was involved and there was not even a question as to the public interest.[14]

The other case cited by section 47(3)'s drafters was *Thorn* v. *Moser* (N.Y. Sup. Ct. 1845) 1 Denio 488, in which the plaintiff sought to recover for statements by the payee of a check drawn by plaintiff charging him with forgery of the check. The court found no privilege on the facts of the case. Moreover, neither a news report nor the public interest were at issue.

The drafters also cited a treatise on the common law, Hilliard, The Law of Torts or Private Wrongs (1859) chapter XIV, page 317. We have found nothing in that work to support the privilege claimed by defendants. Although not referring to a common-interest privilege by name, the author

---

[14] The court stated the general rule as follows: "[W]here the communication is made *bona fide,* in answer to inquiries from one having an interest in the information sought, or where the relation between the parties by whom and to whom the communication is made is such as to render it reasonable and proper that the information should be given, it will be regarded as privileged." (16 N.Y. at p. 374.)

discussed communications made in connection "with some matter of lawful business" and communications by "employers, in reference to the character of their servants." (Hilliard, *supra,* (3d ed. 1866) at pp. 347 and 351.) There is no discussion of a general public-interest privilege to make false accusations against a private person.[15]

The authorities cited by section 47(3)'s drafters suggest no intent to extend the common-interest privilege to the news media. Quite the contrary, they demonstrate that the privilege was meant to be quite limited. It had previously applied to essentially *private* interests, not matters of public interest, and there had to be a genuine *common* interest. (*Rancho La Costa, Inc.* v. *Superior Court, supra,* 106 Cal.App.3d 646, 664-665, quoting 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, §§ 306-309, pp. 2577-2580; Cate, *supra,* 39 Stan.L.Rev. 1201, 1204-1205.) The interest a news publisher has in a story may or may not be shared by its audience. Even if there is a shared interest, it is not "common" within the meaning of the common-interest privilege codified in section 47(3). Moreover, under the common law it was clear that, "A newspaper proprietor has no greater privileges than any other person. He is to stand or fall by the same rules and principles of law." (Folkard, Starkie on Libel and Slander (4th ed. 1877) § 266, p. 326; Townshend, Libel and Slander (3d ed. 1877) § 252, p. 482; Newell, Slander and Libel (4th ed. 1924) § 441, pp. 477-478.)

We find nothing in the legislative history or background of section 47(3) to indicate any legislative intent to create a public-interest privilege for the news media.

*Judicial constructions of section 47(3) do not support an expansive public-interest privilege.*

A. *This court's decisions*

We have construed section 47(3) several times since its enactment in 1872. Although we have found under certain limited conditions a privilege for the news media under section 47(3), we have never found the broad public-interest privilege sought by defendants. We have sometimes referred to the public interest, and defendants misinterpret those references to mean there is a privilege to publish anything about a private individual in which the general public might have an interest. We have never applied the

---

[15] The drafters also cited a third case that involved two doctors' court testimony regarding the plaintiff's sanity. (*Perkins* v. *Mitchell* (N.Y. App. Div. 1860) 31 Barb. 461.) That case involved a privilege for communications made in a judicial proceeding. In California, that privilege is contained in section 47(2), not section 47(3).

statute, however, in cases involving private individuals defamed in the mass media.

As noted above, only one year before section 47(3) was enacted, we held in *Wilson* v. *Fitch, supra,* 41 Cal. 363 that a newspaper publication was not privileged merely because it related to a matter of public interest. Our first applicable decision after the enactment of section 47(3) was *Edwards* v. *Publishing Soc.* (1893) 99 Cal. 431, in which we affirmed a judgment for the plaintiff in a libel action against a newspaper which had published an article asserting that plaintiff would attempt to bribe voters in a municipal election.[16] The meaning of section 47(3) was not an issue, but the court discussed the related issue of whether evidence of the newspaper's good faith or lack of malice should have been admitted in mitigation of damages. We found that such evidence had been properly excluded. (*Id.,* at p. 437.) We explained that, "A newspaper proprietor is not privileged as such in the dissemination of the news, but is liable for what he publishes in the same manner as any other individual." (*Id.,* at p. 439.) Although bribery of voters was clearly a matter of public concern, our reasoning suggested there was no public-interest privilege for the news media.

We specifically addressed the scope of section 47(3) in *Gilman* v. *McClatchy* (1896) 111 Cal. 606 [44 P. 241]. The defendant newspaper published an article in which plaintiff, a private citizen, was accused by his household servant of raping her. The newspaper contended its publication was privileged under section 47(3). The argument was essentially the same as in the present case: "[A] newspaper is a purveyor of news; the people have the right to read the news; any story gleaned by a reporter as this was gleaned, and published in the ordinary course of newspaper business without personal malevolence against the victim of the tale, should be held privileged." (*Id.,* at pp. 613-614.)

We rejected the claim of privilege, emphasizing that the plaintiff was a private citizen. "In support of this contention there is neither authority, law, nor justice. No point of similarity can be found between this case and those which protect a publisher who in good faith discusses the habits, qualifications, and official conduct of a person holding a public office or presenting himself as a candidate therefor." (*Gilman* v. *McClatchy, supra,* 111 Cal. at p. 614.) The distinction we made nearly a century ago between private persons and public officials was appropriate. Before the enactment of section 47(3), there arose in the common law a defense of fair comment, which applied to communications regarding certain conduct of public

---

[16]Although not expressly stated in the opinion, the plaintiff was apparently an employee or agent of a utility company and was acting as a private citizen rather than as a public official. For example, the court referred to "the private character of a citizen." (99 Cal. at p. 437.)

officials and others who put themselves or their work before the public. (Cate, *supra,* 39 Stan.L.Rev. at p. 1205.) The *Gilman* court made clear this defense did not apply to private individuals. "[T]o extend this doctrine . . . against a private individual, would be to put upon the people a greater evil than that which the constitution sought to prevent. [¶] The contention is completely disposed of in this state by the case of *Wilson* v. *Fitch,* 41 Cal. 363." (*Gilman* v. *McClatchy, supra,* 111 Cal. at p. 614.)

Defendants and amici curiae in this case argue that the public has an interest in news and assert this as a justification for a broad privilege. The *Gilman* court rejected this argument with a lengthy quotation from a Michigan case. A portion merits repeating. " 'It is argued that a newspaper in this day and age of the world, when people are hungry for the news, and almost every person is a newspaper reader, must be allowed some latitude and more privilege than is ordinarily given under the law of libel as it had heretofore been understood. . . . [¶] [N]o sophistry of reasoning, and no excuse for the demand of the public for news, or of the peculiarity and magnitude of newspaper work, can avail to alter the law, except, perhaps, by positive statute, which is doubtful . . . .' " (*Gilman* v. *McClatchy, supra,* 111 Cal. at pp. 614-615, quoting *McAllister* v. *Detroit Free Press Co.* (1889) 76 Mich. 338 [43 N.W. 431, 437].) The *Gilman* court plainly rejected the notion that the news media have a privilege under section 47(3) to disseminate a falsehood regarding a private citizen merely because the subject is allegedly a matter of public interest.

We expressly reaffirmed the *Gilman* holding in *Newby* v. *Times-Mirror Co.* (1916) 173 Cal. 387 [160 P. 233], in which we reversed a judgment after jury verdict in favor of a newspaper, which had published a series of articles and cartoons accusing the plaintiff, a well-known lawyer who was active in a political reform campaign, of being a hypocrite and improperly tampering with court documents. The court found no privilege under section 47(3): "The duty of a newspaper to the public does not justify the publication of false and defamatory matter concerning *a private citizen* merely because he is active in promoting his own political views." (*Id.,* at p. 394, italics added; see also *Earl* v. *Times-Mirror Co.* (1921) 185 Cal. 165, 197 [196 P. 57] [citing *Newby, supra,* 173 Cal. 387, with approval and affirming a judgment against a newspaper].)

As is apparent from the foregoing decisions, we have consistently distinguished between public and private citizens. The importance of this distinction was clearly illustrated in *Snively* v. *Record Publishing Co.* (1921) 185 Cal. 565 [198 P. 1]. A general circulation newspaper published a cartoon that portrayed plaintiff, the Los Angeles Chief of Police, as a corrupt public official. We found the publication was privileged under section 47(3). The

linchpin of our decision was the plaintiff's status as a public official. "Since the conduct *of public officers in the administration of their offices* is a matter in which every citizen of the community which they serve is interested, the publication in question, if otherwise privileged, must be considered as one made to persons interested, and on an occasion which would ordinarily afford reasonable grounds for supposing that it was made from innocent motives." (*Id.,* at p. 572, italics added.) The privilege was not based on the argument that newspapers generally publish matters of public interest or that the public is interested in the news. The privilege "does not arise from the fact that the publication is made in a newspaper. It is based on the fact that *the official conduct of public officers . . .* is a matter of public concern of which every citizen may speak in good faith and without malice. The privilege of the newspaper is nowise different from that of any citizen of the community." (*Id.,* at p. 571, italics added.)

The court in *Snively, supra,* 185 Cal. 565, spoke in terms of a public interest, but the defense it recognized was the right of fair comment, recognized at common law, which protected "expressions of opinion about public officials, scientists, artists, composers, performers, authors, and other persons who place themselves or their work in the public eye." (Cate, *supra,* 39 Stan.L.Rev. at p. 1205.) That defense did not protect defamation of *private* citizens.[17] ■■ ■■ ■ It is clear that the court was speaking narrowly of a public interest in the official conduct of public officials, not a privilege as to every person or subject in which there might be some public interest.[18]

---

[17] The parties to *Snively* evidently understood the defense applied only to public officials. Several years after the case was decided, United States District Court Judge Leon R. Yankwich, who had served as the defendant newspaper's counsel in the case, wrote: "In California, until 1921, the only privilege of newspapers recognized in the law of libel was the privilege attaching to fair and true reports of legislative, judicial and other public proceedings and of public meetings. . . . [¶] Since the famous case of *Snively* v. *Record Publishing Company,* decided in 1921, in which I was of counsel for the newspaper, comments on the acts and conduct *of public officials* are also privileged." (Yankwich, *Freedom of the Press in Prospect and Retrospect* (1942) 15 So.Cal.L.Rev. 322, 329-330, italics added, footnote omitted.)

[18] Unfortunately, the fair-comment defense has often been misunderstood in a couple of respects. First, the common-interest privilege and the right of fair comment, which were distinct defenses under the common law, have often been treated as a single defense in cases under section 47(3). (*Institute of Athletic Motivation* v. *University of Illinios* (1980) 114 Cal.App.3d 1, 8-9, fn. 4 [170 Cal.Rptr. 411] [correctly noting the fusion of the two defenses].) We conclude, however, that the Legislature did not intend to include the right of fair comment within section 47(3). As explained above, the language and legislative history of section 47(3) demonstrate that the Legislature intended to codify only the common-interest privilege. (See discussion at pp. 727-729, *ante.*) It is clear, however, that the fair-comment defense had existed long before section 47(3) was enacted, and there is no indication the Legislature intended to abrogate the defense. Thus, the *Snively* court, *supra,* 185 Cal. 565, was correct in relying on the defense but should have treated it as a matter of common law, not as a defense based on section 47(3). The fair-comment defense arises independently of section 47(3),

Two years after *Snively, supra,* 185 Cal. 565, we once again reiterated the distinction between public officials and private citizens in *Stevens* v. *Storke* (1923) 191 Cal. 329 [216 P. 371]. The plaintiff was a public roads contractor. A local general circulation newspaper published an editorial in opposition to a judge's candidacy for public office. The gist of the editorial was that plaintiff was a man of such poor character that his support for a particular candidate should cause the people to vote for someone else. (*Id.,* at p. 334.) In particular, the editorial disparaged the quality of plaintiff's road construction and financial practices. The newspaper contended the editorial was privileged because it concerned a public work in which taxpayers had an interest. We found no privilege because the newspaper's remarks were not intended as criticism of the road work itself or of the plaintiff as a builder of public roads but were directed at him personally. (*Id.,* at p. 337.) The newspaper also claimed a privilege under section 47(3) on the ground that the plaintiff had become a "public man" by supporting a candidate for public office. We found there is no justification for defaming "*a private citizen* merely because he is active in promoting his own political views." (*Ibid.,* italics added.) It seems clear the public was interested in the quality of publicly funded roads and in the quality of candidates for public office. Despite such interest, the *Stevens* court declined to find a privilege under section 47(3).

Defendants mistakenly rely on our decision in *Emde* v. *San Joaquin County etc. Council* (1943) 23 Cal.2d 146 [143 P.2d 20, 150 A.L.R. 916]. The owners of a dairy sued a labor newspaper based on a report that the owners had violated a union contract. We found the publication was privileged under section 47(3), but our decision provides no support for the broad public-interest privilege claimed in this case. That the defendant in *Emde* published a newspaper was not relevant to the decision. We stressed that the newspaper was devoted exclusively to the interests of organized labor and was the official organ of a labor council. We viewed the newspaper not as a mass media publisher but rather as a participant in a labor controversy. We referred to "the union, and those *directly interested in and*

which encompasses only the common-interest privilege. We disapprove of the language in *Snively* and other cases indicating that the fair-comment defense is within section 47(3). (See, e.g., *Maidman* v. *Jewish Publications, Inc.* (1960) 54 Cal.2d 643, 651-652 [7 Cal.Rptr. 617, 355 P.2d 265, 87 A.L.R.2d 439]; *Williams* v. *Daily Review, Inc.* (1965) 236 Cal.App.2d 405, 416 [46 Cal.Rptr. 135]; *Stockton Newspapers, Inc.* v. *Superior Court* (1988) 206 Cal.App.3d 966, 977-978 [254 Cal.Rptr. 389].)

Second, courts and commentators have often stated that fair comment on matters of public concern is "privileged." This terminology is incorrect. As one commentator has explained, "A privileged occasion is one on which the privileged person is entitled to do something which no one who is not within the privilege is entitled to do on that occasion." (Newell, Slander and Libel, *supra,* p. 519.) In the case of fair comment on matters of public concern, however, *all* persons may comment equally. (*Ibid.*) Thus, it is better practice to refer to fair comment as a right rather than a privilege.

*connected with* the labor cause" and noted that the privilege would not apply if the publication had gone beyond the group interest. (*Id.,* at p. 155, italics added.) The privilege applied not because a newspaper was involved but because the union had a privilege to communicate to its members a matter of common interest. *Emde* does not support defendants' view that a communication is privileged merely because it is made by a member of the news media.

Defendants also incorrectly rely on our decision in *Maidman v. Jewish Publications, Inc., supra,* 54 Cal.2d 643. We found that an editorial in a Jewish newspaper criticizing the plaintiff was libelous per se but potentially protected as fair comment. (We also found, however, that the plaintiff had sufficiently alleged malice and reversed a judgment sustaining a demurrer to his complaint.) The basis for the possible defense was the plaintiff's status. We repeatedly noted the plaintiff's "position of prominence in the Southern California Jewish community." (*Id.,* at pp. 649 and 651-652.) Indeed, he was the officer of a rival newspaper. We explained that, " 'It is not only the privilege but the duty of every citizen and every newspaper in the community to fairly and impartially criticize the faults and misconduct *of public officers* . . . .' Maidman [the plaintiff] held a position of importance in the Southern California Jewish community." (*Id.,* at pp. 651-652, italics added, quoting *Jones v. Express Pub. Co.* (1927) 87 Cal.App. 246, 257 [262 P. 78].)[19] It is clear the *Maidman* court was relying on the fair-comment defense, not a public-interest privilege applicable against a private person.

Our prior decisions demonstrate that the public interest sufficient to give rise to a privilege under section 47(3) was the public's interest in public officials, candidates for public office, and those who would be deemed public figures under current law.[20] In each of our decisions, the plaintiff can fairly be said to have been in one or more of those categories. Even if we had not emphasized the public status of the plaintiffs, our decisions would be limited by their facts. None of the plaintiffs were private figures. ■■■ "It is the general rule that the language of an opinion must be construed with reference to the facts presented by the case, and the positive authority of a

---

[19] Based on the facts stated in *Maidman, supra,* 54 Cal.2d 643, it appears that the plaintiff held no governmental office but that he had been elected to official positions in a Jewish organization. Thus, the *Maidman* court arguably viewed the status of public officials as not being limited to those who hold governmental office. Under current constitutional terminology, he likely would have been referred to as a public figure rather than a public official. By noting the current terminology, we express no opinion as to whether he could have properly been found to be a public figure under the standards established by the United States Supreme Court. (See discussion at p. 722, fn. 4, *ante.*)

[20] As explained earlier, the decisions dealing with public officials and public figures occasionally mischaracterized the fair-comment defense as arising from section 47(3) rather than the common law. (See discussion at p. 732, fn. 18, *ante.*)

decision is coextensive only with such facts." (*River Farms Co.* v. *Superior Court* (1933) 131 Cal.App. 365, 369 [21 P.2d 643]; *People* v. *Winkler* (1858) 9 Cal. 234, 236; cf. *Rouch* v. *Enquirer & News of Battle Creek* (1986) 427 Mich. 157 [398 N.W.2d 245, 256] [noting that none of that state's supreme court decisions had applied a public-interest privilege against a private figure plaintiff].) We also note our observation of "[t]he wisdom of limitations on qualified privileges." (*Brewer* v. *Second Baptist Church, supra,* 32 Cal.2d 791, 797.) Our prior decisions offer no support for a news media public-interest privilege under section 47(3).

### B. Court of Appeal decisions

Numerous Court of Appeal decisions also reflect the limited nature of the privilege under section 47(3). (*Jones* v. *Express Pub. Co., supra,* 87 Cal.App. 246 [deputy district attorney]; *Taylor* v. *Lewis* (1933) 132 Cal.App. 381, 384 [22 P.2d 569] [city councilman]; *Morcom* v. *San Francisco Shopping News* (1935) 4 Cal.App.2d 284, 287-288 [40 P.2d 940] [city council president]; *Harris* v. *Curtis Publishing Co.* (1942) 49 Cal.App.2d 340, 349 [121 P.2d 761] [school board president]; *Babcock* v. *McClatchy Newspapers* (1947) 82 Cal.App.2d 528, 535-536 [186 P.2d 737] [district attorney seeking reelection]; *Noonan* v. *Rousselot* (1966) 239 Cal.App.2d 447, 452-453 [48 Cal.Rptr. 817] [candidate for Congress].)[21] Despite this substantial body of law, the Courts of Appeal have on rare occasion either found or suggested a privilege under section 47(3) even when there was no common interest within the meaning of the statute. These isolated cases are incorrect.

In *Glenn* v. *Gibson* (1946) 75 Cal.App.2d 649 [171 P.2d 118], the plaintiff was the owner of a motel, which law enforcement authorities claimed was being used by military men to engage in illicit sex. The defendant newspapers had published a series of articles that reported legal proceedings against plaintiff. The court affirmed the dismissal of her libel action on the ground that she had failed to allege the falsity of the newspapers' allegations against her. (*Id.,* at pp. 657-658.) In dictum, the court stated that the articles were privileged under section 47(3) because they were published in a time of war in a community in which extensive war activities were being conducted and the welfare of those engaged were a matter of "vital concern to every right-thinking person." (*Id.,* at p. 659.) The court cited no authority for its broad dictum.

Defendants also rely on *Williams* v. *Daily Review, Inc., supra,* 236 Cal.App.2d 405. The plaintiff was an engineer who had been awarded a city

---

[21] To the extent that the plaintiffs in these cases were what would now be called public officials or public fugures, the courts should have relied on the common law fair-comment defense rather than section 47(3). (See discussion at p. 732, fn. 18, *ante.*)

road paving contract. The defendant newspaper had published statements regarding his work that the Court of Appeal found to be libelous per se. The court reversed a judgment in favor of the newspaper but for purposes of retrial discussed in dictum the newspaper's claim of a defense of fair comment under section 47(3). The court's discussion is potentially misleading. It stated that "the scope of the term 'public interest' in California is not limited to matters relating solely to public officials." (*Id.,* at p. 417.) For that proposition, the court cited *Glenn* v. *Gibson, supra,* 75 Cal.App.2d 649, and our decision in *Maidman* v. *Jewish Publications, Inc., supra,* 54 Cal.2d 643. As we have explained, the discussion in *Glenn* as to privilege was dictum and unsupported by authority. It therefore was not sound support for the *Williams* court. In *Maidman,* we discussed the right of fair comment only in terms of public persons, and as the *Williams* court acknowledged, the *Maidman* plaintiff was "an individual of renown." We disapprove of the *Williams* and *Glenn* decisions to the extent they suggest there is a news media public-interest privilege under section 47(3) applicable against private persons.

Recent Court of Appeal decisions have more squarely addressed the scope of section 47(3). Two of those decisions sharply conflict as to whether there is a broad public-interest privilege for the news media and have generated considerable commentary. (*Rancho La Costa, Inc.* v. *Superior Court, supra,* 106 Cal.App.3d 646 (hereafter referred to as *Rancho La Costa*) and *Rollenhagen* v. *City of Orange* (1981) 116 Cal.App.3d 414 [172 Cal.Rptr. 49] (hereafter referred to as *Rollenhagen);* Cate, *supra,* 39 Stan.L.Rev. 1201, 1210-1217; Comment, *California Civil Code Section 47(3): Should There Be a Public Interest Privilege in California?* (1987) 20 Loyola L.A. L.Rev. 1559; Comment, *Fair Comment in California: An Unwelcome Guest* (1983) 57 So.Cal.L.Rev. 173.) These two decisions have also led to considerable confusion in the lower courts.

In *Rancho La Costa,* the allegedly defamatory publication was a magazine article that accused the owners of a resort of being members of organized crime. The Court of Appeal issued a writ of mandate directing the trial court to vacate its summary adjudication that the plaintiffs were public figures and that the article was privileged under section 47(3). The magazine claimed the privilege on the ground that the public at large, and thus the magazine's readership, was interested in organized crime. The Court of Appeal rejected this argument, finding that the "privilege of section 47(3) does not apply to a publication by a magazine or newspaper merely because it relates to a matter which may have general public interest." (106 Cal.App.3d at p. 664.) This was a correct statement of the law. ▮ As the court explained, "The word 'interested' as used in the statute refers to a more direct and immediate concern. That concern is something other than

mere general or idle curiosity of the general readership of newspapers and magazines." (*Id.,* at pp. 664-665, citing 4 Witkin, Summary of Cal. Law, Torts, *op. cit. supra*, §§ 306-309, pp. 2577-2580; see discussion at p. 727, *ante*.) The common-interest privilege has traditionally not applied to news media reports and "for the most part the privilege has been circumscribed within more defined and limited relationships." (Smolla, The Law of Defamation (1988) § 3.12[3][a], pp. 8-28 to 8-29.)

Shortly after *Rancho La Costa, supra,* 106 Cal.App.3d 646, a different Court of Appeal found a privilege under section 47(3) but made clear its limited scope. (*Institute of Athletic Motivation* v. *University of Illinois, supra,* 114 Cal.App.3d 1.) The plaintiff was a corporation founded by two clinical psychologists to develop and market a psychological test to identify certain personality traits relevant to success in sports. One of the defendants was a university professor who had published extensively on the subject of sports psychology. He wrote a letter critical of plaintiffs' test, which he sent to numerous professional athletic organizations and sports magazines. The trial court found the letter to be defamatory as a matter of law, and the case went to the jury on the defenses of truth and privilege under section 47(3).

The Court of Appeal found that the letter was privileged as a matter of law, but made clear the limited scope of section 47(3). "In this case, *unlike Rancho La Costa,* the communication was not directed toward the world at large, but mainly toward those involved *as professionals* in the field of athletics. And those to whom it was directed had a potential interest in the subject matter which went well beyond general or idle curiosity. . . . If the contents of the communication were true, it was of *professional* importance for them to know it." (*Institute of Athletic Motivation, supra,* 114 Cal.App.3d 1, 12, italics added.) This explanation acknowledged the *Rancho La Costa* court's (*supra,* 106 Cal.App.3d 646) correct restriction of the privilege to proprietary or narrow private interests.[22]

The privilege was greatly expanded in *Rollenhagen, supra,* 116 Cal.App.3d 414. The plaintiff was a self-employed automobile repairman. As part of a consumer affairs investigation, law enforcement authorities adjusted an automobile and took it to the plaintiff to determine if he would perform unnecessary repairs. Apparently to obtain publicity for their investigation, the authorities alerted a television station of their planned return to plaintiff's garage. The station filmed an interview with a disgruntled

---

[22]Although the Court of Appeal in *Institute of Athletic Motivation* v. *University of Illinois, supra,* 114 Cal.App.3d 1, correctly recognized the limited nature of the common-interest privilege, the court applied it even though the communication was made to a fairly large group of persons who arguably did not have a closely shared interest. We express no view as to whether the court was correct in finding a privilege on those facts.

customer and then accompanied authorities to the garage. As soon as plaintiff accepted payment for the repair, he was arrested for failure to provide a written estimate, "handcuffed, and paraded out before the grinding camera." (*Id.,* at p. 419.) Two days later, the television station broadcast a story that included the arrest, the interview with the customer, and an interview with the plaintiff.

The court construed section 47(3) as "granting a qualified privilege to all publications which concern a matter of legitimate public interest." (*Rollenhagen, supra,* 116 Cal.App.3d 414, 422.) The court recognized that its decision was essentially at odds with *Rancho La Costa, supra,* 106 Cal.App.3d 646, but attempted to harmonize the two decisions on the ground that the *Rancho La Costa* court's definition of "interested" would encompass a story about automobile repair because it was a subject of legislation. (*Rollenhagen, supra,* 116 Cal.App.3d 414 426.) It is clear that the two decisions cannot be harmonized on this ground. Organized crime is no less a subject of governmental legislation than is automobile repair. (See, e.g., the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq.) *Rollenhagen* and *Rancho La Costa* directly conflict as to whether there is a general public-interest privilege for the news media in section 47(3). (Smolla, The Law of Defamation, *supra,* § 3.10, p. 3-24, fn. 90 [noting the conflict].)

The *Rollenhagen* court, *supra,* 116 Cal.App.3d 414, misconstrued the scope of section 47(3). The decision has been correctly questioned for assuming that the common law privilege codified in the statute is so expansive as to cover "the whole spectrum of matters in the public interest." (Smolla, The Law of Defamation, *supra,* § 3.10, p. 3-24, fn. 90.) This court has employed the concept of public interest for more than a century only in connection with communications regarding public officials and those who would now be characterized as public figures. We did not extend a public-interest privilege to communications regarding private persons. We disapprove of *Rollenhagen* to the extent that it states a public-interest privilege applicable against private figures.[23]

*There is no public-interest privilege under section 47(3).*

■■■■■ We hold that a publication or broadcast by a member of the news media to the general public regarding a private person is not privileged under section 47(3) regardless of whether the communication pertains to a matter of public interest.[24]

---

[23] For the same reason, we also disapprove of *Lagies v. Copley* (1980) 110 Cal.App.3d 958, 966-969 [168 Cal.Rptr. 368].

[24] Although we conclude there is no public-interest privilege under section 47(3), we believe it appropriate to note defendants' contention that plaintiff's work as a contractor was a

*Sound policy reasons support our decision not to extend the scope of section 47(3).*

Because the question before us can be answered by statutory construction, our sole function has been to determine legislative intent, not to reach a decision based on public policy, as we might do when dealing with the common law. Defendants and the news media amici curiae, however, argue at length that public policy considerations weigh in favor of a public-interest privilege for the news media under section 47(3). Thus, we believe it appropriate to note several public policy considerations that, if we had some doubt as to the Legislature's intent, would nonetheless lead us to conclude that we should not broadly construe section 47(3) to provide a public-interest privilege.

## A. *Legislative prerogative*

The breadth of the privilege sought by defendants is difficult to overstate. As noted above, a news media defendant would almost certainly argue in every case that the defendant's publication or broadcast was a matter of public interest. (See discussion at p. 725, *ante*.) Indeed, the result implicitly sought by the media in this case is a rule that in effect would be, "If it is published, it is privileged." Such an expansion of section 47(3) would raise serious public policy questions including the need for further restriction of a defamed person's right to recover and whether such restriction should be

matter of public interest because the work involved public funds, i.e., the money for the work was lent to the homeowner by a public agency. Even if there were a public-interest privilege under section 47(3), it would not arise on these facts. In *Hutchinson* v. *Proxmire* (1979) 443 U.S. 111 [61 L.Ed.2d 411, 99 S.Ct. 2675], the court held that "concern about general public expenditures" is insufficient by itself to convert a recipient of public funds into a public figure who must show malice to recover for defamation. (*Id.,* at p. 135 [61 L.Ed.2d at p. 431].) It would be inconsistent with the logic of *Hutchinson* to find that the receipt of public funds by itself creates a public interest that requires a private person to prove malice under section 47(3). Moreover, the use of government funds is pervasive and affects almost everyone, directly or indirectly, in one way or another. For example, under defendants' view, a recipient of a Veterans Administration home loan or a bank customer whose deposits are federally insured might have to prove malice. A mere connection with public funds is too broad a basis on which to require a showing of malice.

We do not suggest, however, that the receipt of public funds can never be a relevant consideration. There may be circumstances in which a plaintiff's receipt or use of public funds is so pervasive or significant that the plaintiff can properly be found to be a public figure subject to the fair-comment defense. For example, dicta in prior cases indicate that a public works contractor may be subject to the fair-comment defense. (*Stevens* v. *Storke, supra,* 191 Cal. 329, 334-335; *Williams* v. *Daily Review, Inc., supra,* 236 Cal.App.2d 405, 417.) Such language, however, should not be read to mean that the mere receipt of public funds is by itself sufficient to give rise to the fair-comment defense. Moreover, it is clear from the facts of the present case that plaintiff's connection with public funds was too remote to give rise to the defense.

accompanied by other changes in the law of defamation. Legal commentators, the news media, and defamation plaintiffs are increasingly urging comprehensive reform of defamation law including substitution of declaratory judgment actions for recovery of damages. (Annenberg Washington Program, Proposal for the Reform of Libel Law (1988), pp. 9-12 (hereafter Libel Reform Project); Editorial, *Reforming Libel Law,* National L. J. (Oct. 24, 1988) p. 12, col. 1.) Such changes require analysis of empirical data and are better dealt with in the legislative arena. (*Cahill v. Hawaiian Paradise Park Corporation* (1975) 56 Hawaii 522 [543 P.2d 1356, 1366] [court refused to create a public-interest privilege and deferred to that state's legislature].) Section 47(3) is a creation of the Legislature, which can act accordingly if it believes the statute should be expanded. For example, in response to the decision in *Branzburg v. Hayes* (1972) 408 U.S. 665 [33 L.Ed.2d 626, 92 S.Ct. 2646], that the First Amendment does not prohibit compelled disclosure by the news media to a grand jury of confidential information, the Legislature proposed and the voters adopted a reporter's shield law. (Cal. Const., art. I, § 2, subd. (b).) "It has not often been thought, by the way, that the press is among the least effective of legislative lobbyists." (*Ollman v. Evans* (D.C. Cir. 1984) 750 F.2d 970, 1039 [242 App.D.C. 301] (dis. opn. of Scalia, J.); McDonald, *Should Punitive Damage Awards in Defamation Suits Be Abolished?,* National L. J. (Nov. 19, 1984) p. 22 [noting extensive legislative lobbying efforts by newspapers].)[25]

## B. *Other jurisdictions*

A public-interest privilege under section 47(3) would impose a malice requirement on private persons that would be contrary to the overwhelming weight of authority from other states. In *Gertz, supra,* 418 U.S. 323, the court held that, provided they do not impose liability without fault, the individual states may define for themselves the appropriate standard of liability for defamation of private individuals. (*Id.,* at p. 347 [41 L.Ed.2d at p. 809].) Since then, almost every state to consider the issue has declined to impose a malice requirement on private persons. (Rest.2d Torts, § 580B, reporter's notes, pp. 465-466; Smolla, The Law of Defamation, *supra,* §§ 3.10-3.11, pp. 8-22 to 8-28.) At least 33 states have clearly adopted a negli-

---

[25] We express no view as to whether legislative expansion of section 47(3) to the extent sought by the news media would conflict with the California Constitution's requirement that every person must be responsible for abuse of the right of free speech or with a right of privacy under the state and federal Constitutions. Nor do we express any view as to whether it would be constitutional to provide the news media with a privilege greater than that afforded to other speakers. In *Philadelphia Newspapers, Inc. v. Hepps* (1986) 475 U.S. 767 [89 L.Ed.2d 783, 106 S.Ct. 1558], a three-member plurality of the court reserved decision as to whether different standards can apply to media and nonmedia defendants. (*Id.,* at p. 779, fn. 4 [89 L.Ed.2d at p. 794].) Other justices, however, contended there can be no valid distinction between media and nonmedia defendants. (*Id.,* at p. 780 [89 L.Ed.2d at p. 795] (dis. opn. of Brennan, J.).)

gence standard for private-figure plaintiffs.[26] Six have applied a negligence standard without discussion.[27] In two states, federal courts have interpreted state law as having adopted a negligence standard.[28] Puerto Rico and one other island jurisdiction have apparently done likewise.[29] Only three states have clearly adopted a malice standard.[30] This overwhelming weight of

[26] *Peagler* v. *Phoenix Newspapers, Inc.* (1977) 114 Ariz. 309 [560 P.2d 1216, 1222]; *Dodrill* v. *Arkansas Democrat Co.* (1979) 265 Ark. 628 [590 S.W.2d 840, 844]; *Gannett Co.* v. *Re* (Del. 1985) 496 A.2d 553, 557; *Phillips* v. *Evening Star Newspaper Co.* (D.C. 1980) 424 A.2d 78, 87; *Miami Herald Pub. Co.* v. *Ane* (Fla. Dist. Ct. App. 1982) 423 So.2d 376, 387, decision approved (Fla. 1984) 458 So.2d 239; *Triangle Publications, Inc.* v. *Chumley* (1984) 253 Ga. 179 [317 S.E.2d 534, 536]; *Cahill* v. *Hawaiian Paradise Park Corporation, supra,* 543 P.2d 1356, 1366; *Troman* v. *Wood* (1975) 62 Ill.2d 184 [340 N.E.2d 292, 299]; *Vinson* v. *Linn-Mar Community School Dist.* (Iowa 1984) 360 N.W.2d 108, 118; *Gobin* v. *Globe Publishing Co.* (1975) 216 Kan. 223 [531 P.2d 76, 84]; *McCall* v. *Courier-Journal & Louisville Times Co.* (Ky. 1981) 623 S.W.2d 882, 886; *Wilson* v. *Capital City Press* (La. Ct. App. 1975) 315 So.2d 393, 396-397 [93 A.L.R.3d 617], certiorari denied specifically approving decision (La. 1975) 320 So.2d 203; *Jacron Sales Co.* v. *Sindorf* (1976) 276 Md. 580 [350 A.2d 688, 697-698]; *Stone* v. *Essex County Newspapers, Inc.* (1975) 367 Mass. 849 [330 N.E.2d 161, 164]; *Rouch* v. *Enquirer & News of Battle Creek, supra,* 398 N.W.2d 245, 265; *Jadwin* v. *Minneapolis Star & Tribune Co.* (Minn. 1985) 367 N.W.2d 476, 491; *Hyde* v. *Columbia* (Mo. Ct. App. 1982) 637 S.W.2d 251, 266; *Madison* v. *Yunker* (1978) 180 Mont. 54 [589 P.2d 126, 133]; *McCusker* v. *Valley News* (1981) 121 N.H. 258 [428 A.2d 493, 494]; *Marchiondo* v. *Brown* (1982) 98 N.M. 394 [649 P.2d 462, 470]; *Walters* v. *Sanford Herald, Inc.* (1976) 31 N.C. Ct. App. 233 [228 S.E.2d 766, 767]; *Lansdowne* v. *Beacon Journal Pub. Co.* (1987) 32 Ohio St.3d 176 [512 N.E.2d 979, 983]; *Martin* v. *Griffin Television, Inc.* (Okla. 1976) 549 P.2d 85, 92; *Bank of Oregon* v. *Independent News, Inc.* (1985) 298 Ore. 434 [693 P.2d 35, 43]; *Rutt* v. *Bethlehems' Globe Pub. Co.* (1984) 335 Pa. Super. Ct. 163 [484 A.2d 72, 83]; *Jones* v. *Sun Pub. Co., Inc.* (1982) 278 S.C. 12 [292 S.E.2d 23, 24-25]; *Memphis Pub. Co.* v. *Nichols* (Tenn. 1978) 569 S.W.2d 412, 418; *Foster* v. *Laredo Newspapers, Inc.* (Tex. 1976) 541 S.W.2d 809, 819; *Seegmiller* v. *KSL, Inc.* (Utah 1981) 626 P.2d 968, 973; *Gazette, Inc.* v. *Harris* (1985) 229 Va. 1 [325 S.E.2d 713, 724-725, 54 A.L.R.4th 685]; *Caruso* v. *Local Union No. 690 of International Brotherhood of Teamsters, etc.* (1983) 100 Wn.2d 343 [670 P.2d 240, 245]; *Havalunch, Inc.* v. *Mazza* (W.Va. 1981) 294 S.E.2d 70, 73; *Denny* v. *Mertz* (1982) 106 Wis.2d 636 [318 N.W.2d 141, 150-151].

[27] *Corbett* v. *Register Publishing Co.* (1975) 33 Conn. Supp. 4 [356 A.2d 472]; *Bandelin* v. *Pietsch* (1977) 98 Idaho 337 [563 P.2d 395]; *Hudson* v. *Guy Gannett Broadcasting Co.* (Me. 1987) 521 A.2d 714, 716; *DeCarvalho* v. *daSilva* (R.I. 1980) 414 A.2d 806; *Colombo* v. *Times-Argus Asso.* (1977) 135 Vt. 454 [380 A.2d 80, 82]; *Adams* v. *Frontier Broadcasting Co.* (Wyo. 1976) 555 P.2d 556.

[28] *Sisemore* v. *U.S. News & World Report, Inc.* (D.Alaska 1987) 662 F.Supp. 1529 (construing Alaska law) and *Brewer* v. *Memphis Pub. Co., Inc.* (5th Cir. 1980) 626 F.2d 1238, 1247 (construing Miss. law).

[29] *Torres Silva* v. *El Mundo, Inc.* (P.R. 1977) 106 D.P.R. 415, 427; *Ali* v. *Daily News Pub. Co., Inc.* (D.V.I. 1982) 540 F.Supp. 142, 144.

[30] *Diversified Management, Inc.* v. *Denver Post, Inc.* (Colo. 1982) 653 P.2d 1103, 1106; *Aafco Heating & Air Conditioning Co.* v. *Northwest Publications, Inc.* (1974) 162 Ind.App. 671 [321 N.E.2d 580, 585-586]; and *Sisler* v. *Gannett Co., Inc.* (1986) 104 N.J. 256 [516 A.2d 1083, 1095] (malice standard limited to certain types of private plaintiffs). New York has adopted a unique standard of gross irresponsibility. (*Chapadeau* v. *Utica Observer-Dispatch, Inc.* (1975) 38 N.Y.2d 196 [341 N.E.2d 569, 571].)

The news media amici curiae contend Michigan has adopted a malice standard and cite as authority an intermediate appellate court's decision in *Gaynes* v. *Allen* (1983) 128 Mich.App. 42 [339 N.W.2d 678, 680-681]. The Michigan Supreme Court, however, has expressly adopt-

authority is reflected in the American Law Institute's approval in the Restatement of Torts of a negligence standard for private plaintiffs. (Rest.2d Torts, § 580B, pp. 221-222.)[31] Similarly, the Libel Reform Project recently recommended that negligence be the minimum standard of fault for private-figure plaintiffs. (Libel Reform Project, *supra,* pp. 17 and 23.)

In adopting a negligence standard, several states have rejected the argument that a malice standard should apply merely because the communication is one of general public interest. (*Troman* v. *Wood, supra,* 340 N.E.2d 292, 299; *Jadwin* v. *Minneapolis Star & Tribune Co., supra,* 367 N.W.2d 476, 489, fn. 16; *Gazette, Inc.* v. *Harris, supra,* 325 S.E.2d 713, 724-725; *Taskett* v. *KING Broadcasting Company* (1976) 86 Wn.2d 439 [546 P.2d 81, 84-86].)

We see no reason to deny California citizens protection for their reputations equal to that provided in other states. We decline to diverge from the near unanimous authority that a private person need prove only negligence (rather than malice) to recover for defamation.

## C. *The importance of reputation*

The news media contend the threat of defamation actions has a "chilling effect" on their willingness to report the news. Stated conversely, the argument is that obstacles to recovery for defamation increase the media's ability to report the news. "The need to avoid self-censorship by the news media is, however, not the only societal value at issue. If it were, this court would have embraced long ago the view that publishers and broadcasters enjoy an unconditional and indefeasible immunity from liability for defamation. . . . Yet absolute protection for the communications media requires a total sacrifice of the competing value served by the law of defamation." (*Gertz, supra,* 418 U.S. at p. 341 [41 L.Ed.2d at p. 806].) There must be a "proper accommodation between the law of defamation and the freedoms of speech and press." (*Id.,* at p. 325 [41 L.Ed.2d at p. 797].) "The great rights guaranteed by the First Amendment carry with them certain responsibilities as well." (*Dun & Bradstreet, Inc.* v. *Greenmoss Builders* (1985) 472 U.S. 749, 764 [86 L.Ed.2d 593, 606, 105 S.Ct. 2939] (conc. opn.

ed the negligence standard. (*Rouch* v. *Enquirer & News of Battle Creek, supra,* 398 N.W.2d 245, 265.)

[31] Section 580B states, "One who publishes a false and defamatory communication concerning a private person, or concerning a public official or public figure in relation to a purely private matter not affecting his conduct, fitness or role in his public capacity, is subject to liability, if, but only if, he (a) knows that the statement is false and that it defames the other, (b) acts in reckless disregard of these matters, or (c) *acts negligently in failing to ascertain them.*" (Italics added.)

of Burger, C. J.).) Accommodation of the value of reputation is also required by this state's Constitution, which expressly provides that *every* person must be responsible for the abuse of the right of free speech. (Cal. Const., art. I, § 2, subd. (a).)

In refusing to impose a malice standard on private persons, another state court eloquently explained the value of reputation: "[T]he defamation action, properly limited, also plays an important role in a free society as it represents the individual's sole remedy against the occasional excesses of the print and electronic media which often have vast resources to inflict untoward damage upon an individual. Surely, a decent, open society cannot, in the name of press and speech freedom, so thoroughly undermine this remedy as to render it useless to those people who have been damaged by a defamatory falsehood negligently uttered in the mass media and have not in any way sought the public limelight. This small modicum of privacy for the average person deserves, in our view, protection under the existing law, particularly in a country such as ours which is dedicated to the preservation of the free individual. . . . It therefore seems neither sensible nor fair to push the parameters of free press and free speech to such an extent, as urged here, that we needlessly plow under other important individual rights." (*Miami Herald Pub. Co.* v. *Ane, supra,* 423 So.2d at p. 387.)

We agree with the Florida court's observation. "[T]echnology has immeasurably increased the power of the press to do both good and evil." (*Rosenbloom* v. *Metromedia, supra,* 403 U.S. at p. 60 [29 L.Ed.2d at p. 321] (conc. opn. of White, J.).) News reporting has directly or indirectly led to grand jury and legislative investigations and the resignation or downfall of powerful public officials, including a President of the United States. Such power is considerable, especially when brought to bear on a private individual. "A society in which men recognize no check upon their freedom soon becomes a society where freedom is the possession of only a savage few; as we have learned to our sorrow." (Hand, The Spirit of Liberty (Dillard 1st ed. 1952) p. 190.) A reasonable degree of protection for a private individual's reputation is essential to our system of ordered liberty. "It is of great importance in a republic, not only to guard the society against the oppression of its rulers; but to guard one part of the society against the injustice of the other part." (The Federalist No. 51 (J. Madison) (Cooke ed. 1961) p. 351.)

The need to redress defamation is as important now as when the tort of defamation was first recognized, perhaps more so. "In an organized and centralized society, where at least economic relationships are likely to be based on an impersonal or reputational level as opposed to the more decentralized and personal approach characteristic of a bygone era, how we are

perceived takes on greater significance. For better or worse, in today's world, most of us are known by our images." (*Rouch* v. *Enquirer & News of Battle Creek, supra,* 398 N.W.2d 245, 264-265.) A tradesman in the 18th century defamed by a customer could rely on his good reputation with others and perhaps had a reasonable opportunity to present the truth to those who mattered to his livelihood. In today's business market, there is little realistic opportunity for self-help when a tradesperson, e.g., a contractor like plaintiff in this case, is disparaged to thousands of potential customers by a television program.

The concern for individual reputation that led the high court in *Gertz* to reject a malice standard applicable against private individuals also weighs against adopting such a standard under the rubric of section 47(3). We agree with the high court's observation that, "the individual's right to the protection of his own good name 'reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty.' " (*Gertz, supra,* 418 U.S. at p. 341 [41 L.Ed.2d at p. 806], quoting *Rosenblatt* v. *Baer* (1966) 383 U.S. 75, 92 [15 L.Ed.2d 597, 609, 86 S.Ct. 669] (conc. opn. of Stewart, J.).) On a practical level, private individuals have less opportunity than public officials and public figures to effectively counteract false statements and are more vulnerable to injury. (*Id.,* at p. 344 [41 L.Ed.2d at p. 808].) As Mark Twain observed, no one should get into a battle with those who use ink by the barrel. ■■■ As a general rule, public officials and figures can be said to have voluntarily exposed themselves to public scrutiny and must accept the consequences. Private individuals are thus more deserving of recovery. (*Id.,* at pp. 344-345 [41 L.Ed.2d at p. 808].)

The public-interest privilege sought by defendants would be contrary, at least in spirit, to the concept of a "public figure" as developed by the courts since *Gertz, supra,* 418 U.S. 323. A person is not a public figure merely because he happens to be involved in a controversy that is newsworthy. (*Time, Inc.* v. *Firestone* (1976) 424 U.S. 448, 452-455 [47 L.Ed.2d 154, 161-164, 96 S.Ct. 958].) "[A] 'public figure' plaintiff must have undertaken some *voluntary* act through which he seeks to influence the resolution of the public issues involved. As such, the mere involvement of a person in a matter which the media deems to be of interest to the public does not, in and of itself, require that such a person become a public figure for the purpose of a subsequent libel action. [¶] In sum, when called upon to make a determination of public figure status, courts should look for evidence of affirmative actions by which purported 'public figures' have thrust themselves into the forefront of particular public controversies." (*Reader's Digest Ass'n.* v. *Superior Court, supra,* 37 Cal.3d 244, 254-255, italics in original; *Vegod Corp.* v. *American Broadcasting Companies, Inc.* (1979) 25 Cal.3d

763, 768-769 [160 Cal.Rptr. 97, 603 P.2d 14].) A "fairly high threshold of public activity" is necessary to elevate a person to public figure status. (Tribe, American Constitutional Law (2d ed. 1988) § 12-13, p. 881.) It would be anomalous to conclude that a person is not a public figure merely because he is involved in a matter of public interest and thus that he need not show malice, but to find that section 47(3) requires him to show malice in a news media communication because he is involved in a matter of public interest. As other courts have noted, a public-interest privilege would undercut the widely recognized distinction between public and private persons. (See, e.g., *Troman* v. *Wood, supra,* 340 N.E.2d 292, 297-298.)

Interpreting section 47(3) to require a private person to prove malice might have another curious result. The distinction between public and private persons reflects a special solicitude for private reputation. Under a section 47(3) privilege, however, a private person might have to show a greater degree of culpability by the defendant than would a public person under the common law fair-comment defense and its constitutional-malice standard. ▮▮ The reason is that, "The malice referred to by the statute [section 47(3)] is actual malice or malice in fact, that is, a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy or injure another person." (*Agarwal* v. *Johnson, supra,* 25 Cal.3d 932, 944.) Constitutional malice, although also often called actual malice, means only that, "[T]he defendant in fact entertained serious doubts as to the truth of his publication." (*St. Amant* v. *Thompson, supra,* 390 U.S. 727, 731 [20 L.Ed.2d 262, 267].) The high court has distinguished traditional malice (ill will) from constitutional malice. (*Beckley Newspapers* v. *Hanks* (1967) 389 U.S. 81, 82 [19 L.Ed.2d 248, 250-251, 88 S.Ct. 197].) Actual hatred or ill will is arguably a much greater degree of fault than mere doubt as to accuracy. If so, a private person subject to section 47(3) would have a greater burden in obtaining redress for a damaged reputation than the high court has seen fit to impose on public persons.[32]

▮▮ Defendants contend a showing of malice is appropriate as a matter of policy under the California Constitution. They rely on observations by California courts that the California Constitution provides greater protection than its federal counterpart for freedom of speech and the press. (*Wilson* v. *Superior Court* (1975) 13 Cal.3d 652, 658 [119 Cal.Rptr. 468, 532 P.2d 116]; *Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 910 [153 Cal.Rptr. 854, 592 P.2d 341], affd. (1980) 447 U.S. 74 [64 L.Ed.2d 741, 100 S.Ct. 2035]; *Spiritual Psychic Science Church of Truth, Inc.* v. *City of Azusa* (1985) 39 Cal.3d 501, 519 [217 Cal.Rptr. 225, 703 P.2d 1119].) None

---

[32] We believe it would be the extremely rare case in which a journalist had actual hatred of a person on whom the journalist was reporting. If actual hatred by journalists is indeed rare, recovery by defamation victims would be equally rare under such a standard.

of the cases relied on by defendants involved the issue of the proper standard of liability in a defamation action. We have recently applied the federal constitutional requirements without suggestion that our state Constitution creates higher obstacles to recovery for defamation. (*McCoy* v. *Hearst Corp.* (1986) 42 Cal.3d 835 [231 Cal.Rptr. 518, 727 P.2d 711]; *Reader's Digest Ass'n.* v. *Superior Court, supra,* 37 Cal.3d 244.)

Article I, section 2, subdivision (a) of the California Constitution states, "Every person may freely speak, write and publish his or her sentiments on all subjects, *being responsible for the abuse of this right. A* law may not restrain or abridge liberty of speech or press." (Italics added.) This provision makes clear that the right to speech is not unfettered and reflects a considered determination that the individual's interest in reputation is worthy of constitutional protection. The federal Constitution, by contrast, contains no express provision imposing responsibility for abuse of the right of free speech. This difference refutes defendants' policy argument that our state Constitution weighs in favor of a standard of fault higher than that required under the federal Constitution.[33]

Society's interest in the value of a private person's reputation weighs against the judicial creation of a privilege (whether by construing a statute or the common law) that would impose burdens greater than those already required under the federal Constitution. In a related defamation context, the high court refused to impose a malice standard on a private individual and thereby diminish the value of reputation "without any convincing assurance that such a sacrifice is required under the First Amendment." (*Time, Inc.* v. *Firestone, supra,* 424 U.S. 448, 456 [47 L.Ed.2d 154, 164].) We agree. There is no compelling evidence before us that there is a need for a statutory privilege that would effectively preclude recovery by a defamed private individual. "Convincing assurance" of the need for further restrictions on private persons can be obtained only after careful consideration of empirical data. As we have explained, such a task is for the Legislature, not this court. (See discussion at pp. 739-740, *ante.*)

D. *Constitutional protections for the news media*

The common-interest privilege codified in section 47(3) and the fair-comment defense were intended to ameliorate the harsh effects of the

---

[33] Other courts have noted similar state constitutional provisions in deciding against a higher standard of fault for private-figure plaintiffs than required under *Gertz, supra,* 418 U.S. 323. (*Troman* v. *Wood, supra,* 340 N.E.2d 292, 297; *Gobin* v. *Globe Publishing Company, supra,* 531 P.2d 76, 83-84; *McCall* v. *Courier-Journal & Louisville Times, supra,* 623 S.W.2d 882, 886; *Madison* v. *Yunker, supra,* 589 P.2d 126, 129; *Martin* v. *Griffin Television, Inc., supra,* 549 P.2d 85, 92.)

common law rule of strict liability for defamation. (Prosser & Keeton, The Law of Torts, *supra,* § 114, p. 815.) As we have noted, that rule was restricted in *New York Times, supra,* 376 U.S. 254, and subsequent cases and abrogated in *Gertz, supra,* 418 U.S. 323. (See discussion at pp. 721-723, *ante.*) Defamation defendants now have a panoply of constitutional protections. *New York Times* has been characterized as "overturning 200 years of libel law" (*Dun & Bradstreet, Inc.* v. *Greenmoss Builders, supra,* 472 U.S. 749, 766 [86 L.Ed.2d 593, 607] (conc. opn. of White, J.)); "almost a transformation" of defamation law (Rest.2d Torts, vol. 3, div. 5, special note, p. 151); and "revolutionary" (*Phillips* v. *Evening Star Newspaper Co., supra,* 424 A.2d 78, 84).

■■ Even as to private-figure plaintiffs, there are now significant constitutional restrictions on the right to recover damages. A private-figure plaintiff must prove at least negligence to recover any damages and, when the speech involves a matter of public concern, he must also prove *New York Times* malice, *supra,* 376 U.S. 254, to recover presumed or punitive damages. (*Gertz, supra,* 418 U.S. at pp. 347 and 349 [41 L.Ed.2d at pp. 809-811]; *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, supra,* 472 U.S. at p. 756 [86 L.Ed.2d at pp. 600-601].) This malice must be established by "clear and convincing proof." (*Gertz, supra,* 418 U.S. at p. 342 [41 L.Ed.2d at p. 807].) For the *New York Times* standard to be met, "the publisher must come close to willfully blinding itself to the falsity of its utterance." (*Philadelphia Newspapers, Inc.* v. *Hepps, supra,* 475 U.S. 767, 783 [89 L.Ed.2d 783, 797] (dis. opn. of Stevens, J.), citing *Garrison* v. *Louisiana* (1964) 379 U.S. 64 [13 L.Ed.2d 125, 85 S.Ct. 209] and *Curtis Publishing Co.* v. *Butts, supra,* 388 U.S. 130.) ■ When the speech involves a matter of public concern, a private-figure plaintiff has the burden of proving the falsity of the defamation. (*Philadelphia Newspapers, Inc.* v. *Hepps, supra,* 475 U.S. 767, 777 [89 L.Ed.2d at p. 793].) ■ Contrary to the normal rule of appellate review, a reviewing court must independently review all the evidence on the issue of malice. (*Bose Corp.* v. *Consumers Union of U.S., Inc.* (1984) 466 U.S. 485, 510-511 [80 L.Ed.2d 502, 523]; *McCoy* v. *Hearst Corp., supra,* 42 Cal.3d 835, 845.)

These constitutional obstacles to recovery provide even greater protection for the news media than the common law privileges. The original reason for those privileges—strict liability for defamation—has disappeared. It is therefore unnecessary to expand the privileges. One of the foremost tort law commentators has explained that when some degree of fault is required, as is now the law, there is no need for any privilege. (Prosser & Keeton, The Law of Torts, *supra,* § 113, p. 808.)

Moreover, expansion of the statutory privilege would unnecessarily complicate defamation law, which is now largely governed by constitutional

doctrine. We agree with the Michigan Supreme Court's observation in this regard when it rejected a public-interest privilege: "The 'policy' behind the public-interest privilege has now been largely engrafted onto the penumbra of our First Amendment rights. The United States Supreme Court has chosen to formulate a constitutional privilege that is intended to advance 'robust and wide-open debate' by measuring the 'public' status of the injured parties, rather than the content of the publication. . . . Ours is not a constitutional mission, and it is not given to us to redesign that standard. We do not think we ought to fashion our state's tort law in a manner that would only fine tune the United States constitutional standard in one respect." (*Rouch* v. *Enquirer & News of Battle Creek, supra,* 398 N.W.2d at p. 264.)

The Michigan court's concern for unnecessary complexity was not theoretical. Almost everyone agrees that the complexities created by *New York Times, supra,* 376 U.S. 254, and its progeny have rendered the law unmanageable. The Libel Reform Project—a group of defamation law scholars, practitioners, journalists, and others—recently reported that, "The attacks have come from all quarters—from judges, academics, journalists, victims of libel, defendants in libel suits and attorneys for both defendants and plaintiffs. *The current system does not work well for anyone.*" (Libel Reform Project, *supra,* p. 9, italics added.)[34] We decline to add yet another wrinkle to the already crumpled face of constitutional defamation law.

E. *Absence of need for an expanded privilege*

We reject the news media's contention that a negligence standard will subject them to such self-exacting scrutiny that it will have a "chilling effect" on the free flow of information. This argument is speculative. Its implicit premise is that if a news media business can be held responsible for falsehoods, it will be less likely to report the news. This suggests that the news media's only reason to be accurate is to avoid legal liability. We are reluctant to attribute such a self-serving motive to the news media. It is equally or more likely that the great majority of journalists strive for accuracy because they are dedicated to high standards of professional craftsmanship. Indeed, accuracy appears to be a journalistic canon of ethics. The Statement of Principles of the American Society of Newspaper Editors states, "Every effort must be made to assure that the news content is accurate . . . ." (Swain, Reporters' Ethics (1978) p. 112.) The Code of Ethics of Sigma Delta Chi, the Society of Professional Journalists, states the principle

[34] The Annenberg Washington Program in Communications Policy Studies is affiliated with Northwestern University. The program's Libel Reform Project was designed to study and debate the current state of libel law and to propose reforms. According to the project's report, its 11 members had a wide variety of backgrounds and viewpoints.

more strongly, "There is no excuse for inaccuracies or lack of thoroughness." (*Id.,* at p. 115.) We reject the notion that the news media are careful only to avoid liability.

A negligence standard is far different from strict liability. A journalist need act only with reasonable care to avoid liability under a negligence standard. Defendants and their amici curiae have not even attempted to make any factual showing that a requirement of reasonable care unduly restricts their ability to report the news. More specifically, they have not identified a single instance in which they have declined to report the news for fear that section 47(3) is not as broad as they would like. (See *Cahill* v. *Hawaiian Paradise Park Corporation, supra,* 543 P.2d 1356, 1366 [noting the absence of any evidence of self-censorship].) Nor have the media attempted to show that the free flow of information has been restricted even in the slightest degree in the overwhelming number of states that have adopted a negligence standard for private-figure plaintiffs. (*Rouch* v. *Enquirer & News of Battle Creek, supra,* 398 N.W.2d 245, 265 [noting the absence of any deleterious effect on journalism in the states that have adopted a negligence standard]; Franklin, *Good Names and Bad Law: A Critique of Libel Law and a Proposal* (1983) 18 U.S.F. L.Rev. 1, 15-16 (hereafter Franklin) [noting little evidence of self-censorship]; McDonald, *Should Punitive Damage Awards in Defamation Suits Be Abolished?, supra,* National L. J. (Nov. 19, 1984) p. 22 [noting empirical evidence of no self-censorship].) The high court in *Gertz, supra,* 418 U.S. 323, and "the overwhelming majority of state courts considering this issue have concluded that no undue chilling effect or self-censorship would result" from a negligence standard for private-figure plaintiffs. (*Memphis Pub. Co.* v. *Nichols, supra,* 569 S.W.2d at p. 418; *Taskett* v. *KING Broadcasting Co., supra,* 546 P.2d at p. 86.)

Aside from the lack of evidence of self-censorship, we doubt that a negligence standard results in substantial self-censorship to avoid possible legal liability for false reporting. As we have explained, the news media likely seek accuracy for professional reasons, not legal ones. Moreover, the theory of self-censorship suggests the typical news organization subjects a significant portion of its reporting to predissemination review for analysis of possible liability. The realities of news reporting—severe time demands, the number of stories, the cost of legal review, journalists' desire for peer recognition, and competition—may effectively preclude such review in most cases. "The raison d'etre of the media is to report news—as much and as quickly as possible. It is not likely that the exercise of such responsibility would shrink in the face of a reasonable-person standard of care." (*Rouch* v. *Enquirer & News of Battle Creek, supra,* 398 N.W.2d 245, 265.) The more reasonable assumption is that the standard of fault is not often a factor in

deciding whether to publish information. Although the standard may have an effect on whether a defendant can obtain summary judgment and on the ultimate outcome of a suit, the actual decision whether to publish a story is probably not based on such contingencies.

In fact, there is considerable evidence the media are *not* unduly hampered in their reporting by defamation actions. "[I]t is difficult to argue that the United States did not have a free and vigorous press before the rule in *New York Times* was announced." (*Dun & Bradstreet, Inc.* v. *Greenmoss Builders, supra,* 472 U.S. at p. 772 [86 L.Ed.2d at p. 611] (conc. opn. of White, J.).) A 1947 study financed by Henry Luce of Time, Inc. "found prominent newspaper lawyers and executives basically satisfied with American defamation law." (Rosenberg, Protecting the Best Men (1986) p. 226.) That same year, the American Civil Liberties Union concluded that there were no pressing problems with libel law. (*Id.,* at pp. 324-325, fn. 44.) These conclusions are especially significant in light of the strict liability standard that was then prevalent. In view of the numerous constitutional limitations on recovery that have been imposed since *New York Times, supra,* 376 U.S. 254, the news media have substantial protection, and they presumably are now equally or more vigorous than before.

Under the *New York Times* standard of fault and related restrictions, a victim of defamation, as a practical matter, seldom recovers damages. In rejecting a public-interest test for private-figure plaintiffs, the *Gertz* court acknowledged that, "Plainly many deserving plaintiffs, including some *intentionally subjected to injury,* will be unable to surmount the barrier of the *New York Times* test." (*Gertz, supra,* 418 U.S. at p. 342 [41 L.Ed.2d at p. 807], italics added.) Justice White explained why plaintiffs rarely prevail: "This will recurringly happen because the putative plaintiff's burden is so exceedingly difficult to satisfy and can be discharged only by expensive litigation. Even if the plaintiff sues, he frequently loses on summary judgment or never gets to the jury because of insufficient proof of malice. If he wins before the jury, verdicts are often overturned by appellate courts for failure to prove malice." (*Dun & Bradstreet, supra,* 472 U.S. at p. 768 [86 L.Ed.2d at p. 608].)

Justice White's observations appear to be well supported by the facts. According to the American Newspaper Publishers Association, only about 10 percent of all libel suits against newspapers are pursued seriously, and according to the Libel Resource Defense Center, a news media-sponsored organization, "Upwards of 90 percent of all seriously litigated cases never go to trial." (Stille, *Libel Law Takes on a New Look,* National L. J. (Oct. 24, 1988) p. 32, col. 3 (hereafter Stille).) If these statistics are accurate, only about 1 percent of libel cases are tried. As to those few, it is generally agreed that "nearly 70 percent of libel awards are overturned on appeal." (*Ibid.;*

see also Eldredge, *supra,* § 52, p. 287 and Franklin, *supra,* 18 U.S.F. L.Rev. 1, 4.)[35] In short, a defamation victim faces almost insurmountable obstacles to recovery within the constitutional limitations. As one plaintiffs' lawyer put it, "It's like going up a greased pole at a 90-degree angle." (Stille, *supra,* at p. 32, col. 3.)

Because public officials and public figures are already subject to the constitutional malice standard, expanding section 47(3) to create a public-interest privilege would impose new restrictions only on private persons. Publications regarding such persons may be the least likely to involve a matter of public interest. Imposing a malice requirement on private persons might therefore be of marginal benefit to increasing the free flow of information on public issues. Moreover, it appears that most libel actions are filed by public officials or figures. One study has shown that more than 60 percent of libel cases against the news media are brought by public status plaintiffs. (Bezanson et al., Libel Law and the Press (1987) p. 10 (hereafter Bezanson).) Thus, the news media apparently already have the benefit of a malice standard in the majority of actions.

Apart from legal protections, the news media already have available to themselves the most powerful defense to a defamation action—the ability to correct error. A recent survey of defamation plaintiffs indicates that their prime objective is generally to set the record straight, not to recover money damages. News editors in the same study were more inclined to attribute a money motive to plaintiffs but agreed that vindication is important to them. (Bezanson, *supra,* pp. 51-52.) The Iowa Libel Research Project also recently observed: "The Libel Research Project was initiated to determine the feasibility of developing non-litigation methods to deal with libel complaints. The findings lead to the conclusion that *an alternative to litigation already exists—in the nation's newsrooms.* More editors need to recognize that how they deal with complaints has an important bearing on whether they ultimately are sued for libel." (*Id.,* at p. 52, italics added.)

In light of the protections already enjoyed by the news media and the doubtful benefit that would result from further restrictions on private persons, we see no need to impose further limitations under the guise of a statutory privilege. As we have explained, the news media's policy arguments in favor of an expanded privilege are speculative. We think it inappropriate to construe section 47(3) expansively based on mere intuition as to whether the news media need additional protection. (*Time, Inc.* v. *Firestone, supra,* 424 U.S. at p. 456 [47 L.Ed.2d at p. 164] [declining to expand news

---

[35] Some empirical studies have found that plaintiffs prevail in a high percentage of cases at trial. (Franklin, *supra,* 18 U.S.F. L.Rev. at p. 4.) A major news media libel insurer recently concluded, however, that news media defendants win "most of the trials." (Stille, *supra,* at p. 32, col. 3.)

media protection without "convincing assurance" that it was needed].) Perhaps the media's arguments are well founded, and there may be ample empirical evidence that warrants a broad public-interest privilege. But, if so, such evidence should be presented to the Legislature. (See discussion at pp. 739-740, *ante.*)

### F. *Self-determination of the public interest by the news media*

As in this case, a news media defendant would presumably argue in every case that its publication or broadcast was a matter of public interest. Defendants and the news media amici curiae have certainly provided no examples of what they publish that is not a matter of public interest. The *practical* effect of their view would be that nearly everything they publish would be a matter of "public interest" and therefore privileged. The news media would have a privilege shared by no other speaker.

It can be fairly said that the media themselves often select, by virtue of what they choose to publish, the subjects that become matters of public interest. "[T]he decisions they [media executives] make about which stories are worth covering and which are not largely determine what issues emerge on the national agenda for discussion and action by the Congress, the courts, the White House and the body politic." (Shaw, *East Coast Bias Colors the Media,* L.A. Times (Nov. 17, 1988) pt. 1, p. 1, col. 1; see also Bagdikian, The Media Monopoly (2d ed. 1987) p. 10.) A treatise published by the American Newspaper Publishers Association Foundation states, "The bootstrap nature of this extension [of a privilege to everything that is published] contains inherent dangers for individual reputation and would largely do away with recovery for defamation. To a significant extent, the mere act of publishing material in the mass media creates public interest in its contents. The more sensational and hence injurious a statement is, the more 'public interest' it generates. Consequently, the more damaging the charge, the more likely it would be privileged even though negligently erroneous." (1 Hanson, Libel and Related Torts (1969) ¶ 141, p. 109; *Phillips* v. *Evening Star Newspaper Co., supra,* 424 A.2d at p. 84, fn. 5 [recognizing bootstrap nature of a public-interest privilege]; *Miami Herald Pub. Co.* v. *Ane, supra,* 423 So.2d 376, 387, fn. 5 [noting that little in daily newspaper is not a matter of public interest].)[36]

---

[36] A simple hypothetical may help to illustrate our concern over the bootstrap nature of the privilege sought under section 47(3). The statutory definition of slander provides that it may be committed by the imputation of the present existence of an infectious or contagious disease. (§ 46.) Assume that John and Mary are social acquaintances and that both are private persons, not public figures of any kind. Mary mistakenly believes that John has a contagious, sexually transmitted disease. At an office party, she tells her coworkers that John has the disease. John is not a coworker, and no one present knows him or has any interest in his health. Mary's statement would not be privileged under section 47(3). Assume, however, that Mary is interviewed for a television news story about sexual diseases, and she tells the reporter that

The ability to shape public discussion and define the public interest may be a necessary result of the news media's function, but we reject the notion that a news-media defendant should be allowed to determine for practical purposes, by virtue of what it chooses to publish or broadcast, whether its communication is privileged and thus to determine by what standard of fault it will be judged.[37]

### G. *Disadvantages for the news media*

It has become apparent in the years since *New York Times, supra,* 376 U.S. 254, was decided that a malice standard of fault carries significant burdens as well as benefits for the news media. ▮▮▮ Under that standard, liability requires proof of knowing falsehood or a subjective awareness of probable falsity. A plaintiff is therefore allowed wide ranging access to discovery regarding the editorial process. (*Herbert* v. *Lando* (1979) 441 U.S. 153 [60 L.Ed.2d 115, 99 S.Ct. 1635].) "[M]any lawyers acknowledge that, by setting a standard of 'actual malice,' and forcing plaintiffs to focus on the inner workings of the editorial process, it [*New York Times*] also made libel cases longer and more costly." (Stille, *supra,* National L. J. (Oct. 24, 1988) p. 32, col. 4 to p. 33, col. 1.) One comprehensive study of libel law found

---

John has such a disease. The reporter then prepares a story in which he states that John has the disease. Presumably, there is a public interest in communicable diseases, and under defendants' view the reporter's false statement about John would be privileged under section 47(3). What was not protected as gossip to a small number of people would become privileged by virtue of the very act that causes a greater harm, reporting the falsehood to the general public. Such result is untenable.

[37] The news media contend a public-interest privilege under section 47(3) is warranted by the policies underlying the decisions in *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, supra,* 472 U.S. 749 and *Philadelphia Newspapers, Inc.* v. *Hepps, supra,* 475 U.S. 767. The media read those decisions too broadly.

In *Dun & Bradstreet, supra,* 472 U.S. 749, a plurality of the court held that the *Gertz, supra,* 418 U.S. 323, requirement of a showing of malice to recover presumed and punitive damages applies only when the defamatory speech regards a matter of public concern. In *Philadelphia Newspapers, supra,* 475 U.S. 767, 777 [89 L.Ed.2d 783, 793], a plurality held that "the common law presumption that defamatory speech is false cannot stand when a plaintiff seeks damages against a media defendant for speech of public concern." A plaintiff has the burden of proving falsity in such circumstance. The news media contend these two decisions reflect a special concern for communications in the public interest and that the same concern warrants a news media privilege under section 47(3) that would require a showing of malice by a private-figure plaintiff.

We disagree. *Dun & Bradstreet, supra,* 472 U.S. 749, affects only the showing required for presumed and punitive damages, and *Philadelphia Newspapers, supra,* 475 U.S. 767, affects only the burden of proof as to falsity. Neither opinion affects the standard of fault required to recover proven compensatory damages. The high court has not adopted the public-interest privilege that was soundly rejected in *Gertz, supra,* 418 U.S. 323.

*Philadelphia Newspapers,* however, does change California law in one respect, by partially abrogating our holding in *Lipman* v. *Brisbane Elementary Sch. Dist.* (1961) 55 Cal.2d 224, 233 [11 Cal.Rptr. 97, 359 P.2d 465], that "The burden of proof with respect to the issue of truth or falsity is on the defendant." That statement is no longer the law when the communication involves a matter of public concern within the meaning of *Philadelphia Newspapers.*

that "[T]he frequency of damage awards—much less large ones—is exceedingly rare. . . . The largest cost to the media is the insurance premium, and these seem largely related to the cost of *defending* in litigation, rather than the cost of damage awards." (Bezanson, *supra,* p. 301, fn. 130, italics added; Franklin, *supra,* 18 U.S.F. L.Rev. p. 19.) The Libel Reform Project recently concluded, "Ironically, the costs [of libel litigation] are increased by special rules designed to protect the defendants and preserve freedom of the press . . . ." (Libel Reform Project, *supra,* p. 9.) In short, it has become widely recognized that the expense of defamation suits the news media seek to avoid appears to be in large measure the result of the very privilege they insisted they must have to avoid expensive litigation.

There may be another, more subtle effect of a constitutional-malice standard that works against the news media. Some observers have suggested that the news media, given the protections of *New York Times, supra,* 376 U.S. 254, and its progeny, have been reluctant to correct factual error. (Bezanson, *supra,* pp. 26-28; Franklin, *supra,* 18 U.S.F. L.Rev. p. 32.)[38] In such cases, the defamation victims, faced with a refusal to correct the record, may have little choice but to litigate in order to clear their reputations. The constitutional protections themselves have been blamed for spawning conduct that leads to the expensive litigation the news media seek to avoid.[39]

Similarly, it appears that the number of defamation actions against media defendants has increased since the high court's development of constitutional protection for falsehoods. As another state supreme court has noted, this increase may reflect the fact that "litigants and juries often send warning signals regarding a need to redress grievances or injuries not otherwise tended to in society." (*Rouch* v. *Enquirer & News of Battle Creek, supra,* 398 N.W.2d 245, 265, fn. 27.) Several news media observers have also surmised that a popular perception of journalistic arrogance may be the reason why juries often rule against libel defendants. (Franklin, *supra,* 18 U.S.F. L.Rev. at p. 9.) Excessive protection for defamation may result in a popular antipathy toward the press that manifests itself in lawsuits and jury verdicts.[40]

---

[38] A survey of newspaper editors revealed widespread agreement among them that newspapers are often unresponsive to complaints of error and uncooperative with those who seek redress. (Bezanson, *supra,* pp. 46-47.)

[39] This result may be somewhat self-correcting. As a result of the awareness of litigation costs, an increasing number of journalists appear to be willing to respond to complaints of error. (Stille, *supra,* National L. J. (Oct. 24, 1988) p. 33, col. 2.)

[40] If the perception of an extreme reluctance to correct error is accurate, it further suggests that current defamation law has not caused the degree of self-censorship claimed by the news media. If a publisher refuses to act reasonably after publication in such a way as to minimize the likelihood of a lawsuit, e.g., by correcting error, it is reasonable to assume that its

The burdens that the *New York Times* malice standard has apparently imposed on defendants as well as plaintiffs weigh against judicially expanding section 47(3) to require private-figure plaintiffs to show malice.

## H. *Commercial aspects of news media*

The bedrock of the news media's argument for increased protection is that the costs of defamation actions, either in terms of judgments or litigation costs, stifle their ability to present the news. Perhaps the media are correct, but as we have explained, they have not submitted any evidence to support this argument. That point aside, the argument is not logically persuasive when the injured plaintiff is a private person. Under defendants' theory, one could argue that a publisher or broadcaster could better cover a "breaking" news story if its reporter could drive 100 miles per hour to get to the location of the story. No right thinking person, however, would argue that a pedestrian run over and seriously injured by the reporter should have to show malice to recover. ██ " 'The publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others.' " (*Branzburg* v. *Hayes, supra,* 408 U.S. 665, 683 [33 L.Ed.2d 626, 640], quoting *Associated Press* v. *Labor Board* (1937) 301 U.S. 103, 132-133 [81 L.Ed. 953, 961, 57 S.Ct. 650]; *Miller* v. *National Broadcasting Co.* (1986) 187 Cal.App.3d 1463, 1492 [232 Cal.Rptr. 668, 69 A.L.R.4th 1027].) The injuries suffered from defamation can be more real and debilitating—at least emotionally and financially—than palpable physical injuries and are equally worthy of compensation.

The vast majority of news media entities operate for profit. This is a less important policy consideration than those we have discussed above but does merit note. With rare exception, it is fanciful to view the news media as a group of lonely leafleteers. "Vast communication combines have been built into profitable ventures." (*Rosenbloom* v. *Metromedia, supra,* 403 U.S. at p. 60 [29 L.Ed.2d at p. 321] (conc. opn. of White, J.).) It has recently been reported that "twenty-nine corporations control most of the business in daily newspapers, magazines, television, books, and motion pictures" and predicted that "by the 1990s a half-dozen large corporations will own all the most powerful media outlets in the United States." (Bagdikian, The Media Monopoly, *supra,* p. 4.) Indeed, the news media amici curiae who have appeared in this action are entities of enormous financial resources.[41] When they negligently defame a private person, it is not unfair for them to pay for the injury. "Newspapers, magazines, and broadcasting companies are

---

prepublication conduct was equally free of concern for liability and that the publisher did not engage in self-censorship.

 [41] They include The Times Mirror Company; National Broadcasting Company, Inc.; The Hearst Corporation; CBS, Inc.; Gannett Co., Inc.; and Capital Cities/ABC, Inc.

businesses conducted for profit and often make very large ones. Like other enterprises that inflict damage in the course of performing a service highly useful to the public, such as providers of food or shelter or manufacturers of drugs designed to ease or prolong life, they must pay the freight . . . ." (*Buckley* v. *New York Post Corporation* (2d Cir. 1967) 373 F.2d 175, 182 [20 A.L.R.3d 942].)

We recognize that not every member of the media possesses the great wealth of those who have the most power and widest audiences. We think it will be the unusual plaintiff, however, who seeks to obtain an excessive verdict from a penurious defendant. Simple economics, including the cost of legal representation, mitigate against such a course of action. (McDonald, *Should Punitive Damage Awards in Defamation Suits Be Abolished?, supra,* National L. J. (Nov. 19, 1984) p. 22 [noting little evidence of suits against small publishers].)

## CONCLUSION

We find no support in the language or history of section 47(3) for the broad public-interest privilege claimed by defendants. Sound public policy reasons also weigh heavily against such a privilege.

Because we find there is no such privilege in this case, we agree with the Court of Appeal that summary judgment was improper. The judgment of the Court of Appeal is affirmed with directions to remand this action to the trial court for further proceedings in accordance with the views set forth in this opinion.

Lucas, C. J., Mosk, J., Broussard, J., Panelli, J., Kaufman, J., and Lucas (Campbell M.), J.,* concurred.

---

* Presiding Justice, Court of Appeal, Second Appellate District, Division Five, assigned by the Chairperson of the Judicial Council.